**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIPAT DONOVAN,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | **Case No. 05 C 3533** |
| **v.** | ) | |
| | ) | **Magistrate Judge Nan R. Nolan** |
| **VICTORIA C. QUADE and** | ) | |
| **QUADE/DONOVAN ENTERTAINMENT, INC.,** | ) | |
| **an Illinois corporation,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case arises out of a disintegrating business relationship between the two co-owners of the copyrights in a play called *Late Nite Catechism* ("LNC"), who also jointly own a corporation, Quade/Donovan Entertainment, Inc. ("QDE"). Plaintiff/Counter-Defendant Maripat Donovan ("Donovan") has brought claims for accounting, breach of fiduciary duty and to remove Defendant Victoria Quade ("Quade") as an officer of QDE. Defendants/Counter-Plaintiffs Quade and QDE filed counterclaims for breach of contract, deprivation of copyright revenues, diversion of corporate opportunity, tortious interference with contract, and an accounting. By consent, the Court conducted a bench trial on all remaining issues from April 25, 2011 to April 29, 2011. Certain pre-trial motions and trial issues remain pending, which the Court initially addresses below. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**I.     Remaining Pre-Trial Motions and Trial Issues**

      **A.     Plaintiff's Motion to Dismiss Amended Counterclaim (Doc. 242)**

Donovan has moved to dismiss Defendants' second amended counterclaim pursuant to Rule 12(b)(6), arguing that Counts I-III and V of the counterclaim fail to state a claim upon which

relief may be granted.[1]  Donovan's motion to dismiss is primarily based on her belief that Defendants improperly seek joint recovery under each count in the second amended counterclaim. Donovan's motion (doc. 242) is granted in part and denied in part to the extent described below.

With regard to Count I for breach of contract, Donovan argues that QDE has no basis for making a claim under the purported written partnership agreement between Donovan and Quade. Donovan asserts that no facts have been pled to establish that QDE was a signatory to the document or has any rights under it.[2]  Donovan argues that Count II for deprivation of copyright revenues fails to state a claim as to QDE because the complaint fails to allege that QDE has any interest in any copyright.  As to Count III for diversion of corporate opportunity, Donovan complains that there is no allegation explaining how both Quade individually and QDE jointly own a corporate opportunity which would entitle them to joint recovery under this count.  Donovan asserts that there is no basis for Quade individually to claim damages for diversion of a corporate opportunity.  With regard to Count V for an accounting, Donovan similarly claims that no facts are pled which establish a joint right to an accounting by Quade and QDE on all four remaining counts of the counterclaim.

In response to Donovan's motion, Defendants fail to directly address the precise issue of whether they jointly intended to pursue all four remaining counts in the second amended counterclaim against Donovan.  Defendants assert that Donovan is taking an overly technical reading of the counts in the counterclaim.  Defendants explain that the amount of Quade's

---

[1] Defendants have withdrawn Count IV alleging tortious interference.  Doc. 243; Tr. at 48-49.

[2] In her reply brief, Donovan argues that Quade cannot state a claim under the partnership agreement because Donovan's LNC sequels were not produced until after 2004.  Donovan's opening memorandum made no mention of this argument.  The Court does not consider arguments raised for the first time in a reply brief.  Narducci v. Moore 572 F.3d 313, 324 (7th Cir. 2009) (stating "[t]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

damages under the theories of breach of contract (Count I) and diversion of corporate opportunity (Count III) is the same: Quade is entitled to half of the profits earned by Donovan that should have been shared with Quade.  Donovan will either pay half of the profits she made directly to Quade or she will pay all of the profits she made to QDE, of which Quade and Donovan will each get half as 50% shareholders.  Defendants asset that the same is true for Count II (deprivation of copyright revenues) and Count V (accounting).  Defendants say: "If the money is going to be paid directly to Quade, then she is entitled to the accounting.  If money is going to be paid to QDE, then the corporation is entitled to the accounting."  Doc. 256 at 2, n.2.  Defendants emphasize that the end result is the same and it does not matter that the counts are jointly brought by both parties in the second amended counterclaim.

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint or counterclaim. Rule 8(a) requires a pleading that states a claim for relief to contain a "short and plain statement" of the claim, the basis for federal jurisdiction, and a demand for the relief sought.  Rule 8(e) instructs courts that "[p]leadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).  The Supreme Court has cautioned that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."  Conley v. Gibson, 355 U.S. 41, 48 (1957); Luckett v. Rent-A-Center, Inc., 53 F.3d 871, 873 (7th Cir. 1995) (stating "[d]istrict judges must heed the message of Rule 8: the pleading stage in not the occasion for technicalities.").  "One objective of Rule 8 is to decide cases fairly on their merits, not debate finer points of pleading where opponents have fair notice of the claim or defense."  Bausch v. Stryker Corp., 630 F.3d 546, 562 (7th Cir. 2010) (citing Fed. R. Civ. P. 8 (e)).

Counts I (breach of contract) and II (deprivation of copyright revenues) of the counterclaim purport to be brought by both Quade and QDE, but Defendants have not demonstrated that Counts I and II state a claim as to QDE.  However, other language in the second amended

counterclaim can be read to cure this problem as to QDE with regard to Counts I and II.  As to Count I, paragraphs 93 and 94 clearly allege that Donovan has breached the partnership agreement by failing to share control and benefits related to derivative works with Quade and that only Quade has been damaged by Donovan's breaches of the partnership agreement.  Similarly, Count II is clear that Quade was deprived of her rightful copyright revenues and has been damaged by Donovan's deprivation of copyright revenues.  Doc. 240 at ¶¶ 97, 98.  At this stage of the litigation, the Court is unwilling to place form over substance and require Defendants to amend their counterclaim to take out references to QDE in Counts I and II.  Given the inexact wording in the counterclaim, the Court construes Counts I and II as excluding QDE from consideration.  QDE will not be able to recover under Counts I and II of the second amended counterclaim.

In Count III for diversion of corporate opportunity, Defendants allege that Donovan has never accounted to nor paid any money to Quade and QDE for any revenues generated in connection with Donovan's productions or licensing of Donovan's LNC sequels.  Doc. 240 at ¶¶ 106, 107.  An officer's or director's usurpation of a corporate opportunity breaches a duty owed to the corporation, not the individual shareholders, who may only share in the corporation's recovery from the officer or director.  In re Marriage of Schweihs, 650 N.E.2d 569, 577 (Ill. App. 1995).  Thus, Donovan is probably correct that the right of recovery under Count III of the counterclaim belongs to QDE and not Quade as an individual shareholder.  Donovan's motion to dismiss the diversion of corporate opportunity count against Quade is granted.

Defendants' final count for an accounting alleges that "Quade and QDE are entitled to an accounting from Donovan and any and all business owned or controlled by her for all revenues generated and all expenses incurred in connection with all the foregoing."  Doc. 240 at ¶ 120.  Whether Defendants are entitled to an accounting will be determined consistent with the Court's construction of the second amended counterclaim herein.

In the last paragraph of her motion to dismiss, Donovan alleges that a conflict exists between the interests of Quade and QDE and suggests that it is impermissible for the "same attorneys to represent two parties whose interests are not fully aligned in seeking the identical recovery." Doc. 242 at 3. Donovan contends that "Quade directs the litigation and has an obvious interest in directing the recovery to herself, rather than to the corporation which is alleged to be half owned by Donovan." Id.[3]

Donovan's argument is unpersuasive. As Defendants explain, the amount of money Quade seeks to recover is the same regardless of whether Donovan pays half of the profits due directly to Quade if she prevails under Count I and/or Count II or whether Donovan pays all of the profits due to QDE if it prevails under Count III, half of which would get distributed to Quade as a 50% shareholder in the corporation. Under this circumstance, the interests of Quade and QDE are not adverse or incompatible. Counts I through III of the second amended counterclaim seek identical damages for the same alleged wrongful act under differing theories of recovery, *i.e.*, breach of contract, deprivation of copyright revenues, and diversion of corporate opportunity. Quade has an adequate interest in vigorously litigating Count III because she will receive an indirect benefit as a 50% shareholder from any corporate recovery, which in this case is the exact same direct benefit she would receive under Counts I or II. Defendants are free to plead all three theories of recovery, but Defendants cannot recover more than once for the same injury or damages. Cange v. Stotler and Co., Inc., 826 F.2d 581, 585 n.2 (7th Cir. 1987) (stating "[o]f course multiple recoveries for the same injury will not be allowed but plaintiff can pursue in the district court his multiple theories entitling him to recover.").

---

[3] Donovan's reply brief expands on her conflict of interest argument by, among other things, citing Local Rule 83.51.7 for the first time, but it is too late to introduce a new, broader argument in a reply brief. United States v. McCauley, 2011 WL 4600477, at *7 n.4 (7th Cir. Nov. 3, 2010). In any event, the current record does not demonstrate that there is any risk that the representation of QDE will be materially limited by defense counsel's responsibilities to Quade.

**B.      Plaintiff's Motion in Limine to Exclude Two Donovan Letters (Doc. 196)**

Donovan moved pursuant to Federal Rules of Evidence 401 and 403 to exclude evidence or argument at trial regarding two handwritten letters dated June 27, 1995 and July 9, 1995 from Donovan to Quade.  Donovan contends that the letters are irrelevant to the issue of whether she in fact signed the written partnership agreement.  Donovan also argues that the letters should be excluded under Rule 403 because they indicate that Donovan was receiving therapy in 1995 and contain very personal statements related to the parties' intimate relationship that will embarrass her and may unfairly prejudice her before the trier of fact.  Defendants respond that the June 27, 1995 letter is relevant to the authorship of LNC and because it refers to a discussion about writing a sequel to LNC.  Defendants argue that the second letter dated July 9, 1995 is relevant because Donovan expresses her intent to sign a partnership agreement with Quade.  The Court agrees with Donovan that the relevance of the letters is arguable.  However, in the context of a bench trial, Donovan's arguments are better directed toward the weight of the evidence, not admissibility.  Donovan's motion is denied.  The handwritten letters are admissible, and the Court will assign them the appropriate weight, if any.

**C.      Plaintiff's Motion to Modify Amended Pre-Trial Order to Add Exhibit (Doc. 232)**

Donovan moves to modify the Amended Pre-Trial Order to identify the Award of Arbitrator and Decision in <u>Quade v. Entertainment Events</u>, Case No. 12 140 Y 00169 07 (New York 2011) as an additional exhibit.  Donovan's motion (doc. 232) is granted and the Court will consider the arbitration award and decision to the extent they are relevant.

**D.      Defendants' Rule 408 Objection (Doc. 244)**

During the examination of Quade on April 25, 2011, Donovan's counsel asked Quade about an offer sent via email to the officers of Entertainment Events, Inc. ("Entertainment Events") in 2003.  In that email, Quade offered that Entertainment Events pay Quade 2% of the gross box

office receipts from Entertainment Events' production of Donovan's LNC sequels. Defendants objected under Federal Rule of Evidence 408(a) on the grounds that the questioning was directed to the content of settlement negotiations and was being offered to prove the amount of a disputed claim.

Federal Rule of Evidence 408 provides:

(a) Prohibited uses. – Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish–or accepting or offering or promising to accept–a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. The primary purpose behind Rule 408 is to encourage settlement negotiations, which might be chilled if offers of compromise may be used later as admissions of liability. Zurich American Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 689 (7th Cir. 2005). The rule is not an absolute ban on all evidence regarding settlement negotiations. Courts have admitted evidence of offers or agreements to compromise for purposes other than liability, such as to show bias or prejudice of a witness; rebuttal; impeachment; to show knowledge or intent; to show a continuing course of reckless conduct; and to prove estoppel. Id.; Bankcard America, Inc. v. Universal Bancard Sys., Inc., 203 F.3d 477, 484 (7th Cir. 2000). In deciding whether evidence should be excluded under Rule 408, "courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future

settlement negotiations." <u>Zurich</u>, 417 F.3d at 689.

Quade explains that in the fall of 2003, a dispute arose between Quade, Donovan and Entertainment Events after Quade discovered that Entertainment Events acquired the rights to Donovan's LNC sequels without including Quade in the deal. According to Quade, the dispute concerned whether, and for what amount, Quade was entitled to author royalties from Entertainment Events' productions of Donovan's LNC sequels. Quade says that the first paragraph of the October 6, 2003 email she wrote to Tim Flaherty and John Pratt of Entertainment Events shows that this was an ongoing negotiation ("This is the letter you have been requesting from me") and that Quade had retained an attorney ("I have been consulting an attorney . . ."). Quade argues that the last paragraph of the October 6, 2003 email establishes that this was a compromise that contemplated further attorney involvement ("These percentages are so low that I really hope no bargaining needs to be done, and we can wrap this up very quickly. If you like, I'll even have my lawyer draft an agreement that includes these terms."). Finally, Quade contends that an email dated November 4, 2003 from Quade to both Donovan and Entertainment Events shows that the dispute involved all three parties ("I'd like to finalize an agreement over the sequel and then let the two of us move on with our lives.").

Donovan responds that Rule 408 does not apply to Quade's communications with Entertainment Events in October 2003 regarding author royalties on potential LNC sequels because (1) there was no claim or dispute between Quade and Entertainment Events in October 2003; (2) the subject matter of the communication was unrelated to the claim in this case against Donovan; and (3) settlement negotiation evidence can be offered for purposes other than liability. With regard to the later, Donovan says that the challenged communication is offered to show that in 2003, Quade did not assert that she was entitled to 50% of royalties on Donovan's LNC sequels under the written partnership agreement as she contends in this lawsuit. Rather, Quade proposed that she be paid a 2% underlying rights payment for Donovan's LNC sequels.

Rule 408 does not bar evidence that certain statements were not made during compromise negotiations or that an adversary never advance the construction of the contract she now urges during attempts to settle a dispute. Wright & Miller, Federal Practice and Procedure: Evidence § 5308, at 239 (1980) (stating that "[r]ead literally, Rule 408 would not seem to prohibit evidence that an offer of compromise was not made or that certain statements were not made during negotiations. Nor does there seem any strong reasons for departing from the literal interpretation."); Sunstar, Inc. v. Alberto-Culver Co., 2004 WL 1899927, at *23 (N.D. Ill. Aug. 23, 2004); see also Winchester Packaging, Inc. v. Mobil Chemical Co., 14 F.3d 316, 319-21 (7th Cir. 1994) (holding trial judge did not abuse his discretion under Rule 408 in excluding correspondence which did not include an interpretation of the contract advanced by plaintiff at trial but noting that "the question [was] so close that had the judge admitted it we would uphold that ruling as readily."). Here, the challenged evidence can be offered for the limited purpose of showing that Quade did not take the position in the fall of 2003 when the issue of author royalties from Donovan's LNC sequels arose that she was entitled to 50% of royalties under a written partnership agreement she had with Donovan. The purpose in admitting Quade's failure to take such a position is to prove Quade's intent under the written partnership agreement with respect to individually authored LNC sequels. This a permissible purpose and does not violate Rule 408's purpose of encouraging settlements. Bankcard America, 203 F.3d at 484 (noting courts have admitted evidence of offers or agreements to compromise for purposes of showing knowledge and intent). The email is not being admitted to prove the amount of a reasonable underlying rights royalty rate.

### E. Collateral Estoppel (Doc. 253)

In her Memorandum in Support of Application of Collateral Estoppel (doc. 253), Donovan argues that the Quade/EEI arbitration decision precludes Quade from arguing in support of her diversion of corporate opportunity counterclaim that she and QDE own any right to produce LNC

sequels outside of a 50 mile radius of downtown Chicago and that Quade's Sequels featuring "Mother Superior" are not LNC sequels under the doctrine of collateral estoppel. In 2007, Quade initiated arbitration proceedings against Entertainment Events. On February 22, 2011, the arbitrator issued an eight-page decision concluding, among other things, that Quade's production of her LNC sequels outside the Chicago radius was and is likely to conflict with Entertainment's use of its right as provided in paragraph 10.1 of the 1995 agreement between Donovan and Quade and Entertainment Events. Pl's Exh. 33 at ¶ II(F). Paragraph 10.1 is "a negative covenant prohibiting the Authors from presenting live stage performances of LNC or 'any play featuring the character 'Sister' that is reasonably likely to conflict with [Entertainment Events'] use of its right in [LNC],' outside the Chicago radius while [Entertainment Events'] rights in LNC remain in effect." Id. That paragraph gave Entertainment Events the right to prohibit Quade from producing LNC sequels outside of the Chicago radius, but did not grant Entertainment Events its own rights to produce LNC sequels.

In response, Defendants do not dispute that the arbitrator determined that Quade and Donovan did not have the right to produce LNC sequels in Entertainment Events' territory. Defendants also do not dispute that Quade could not produce her LNC sequels outside the 50-mile Chicago radius without Entertainment Events' consent. It is further undisputed that Quade's Sequels, including her "Mother Superior" plays, are LNC sequels. Doc. 264 at 3 n.2. In light of these uncontested facts, Donovan's collateral estoppel arguments that the arbitrator's award establishes that Quade and QDE do not own the right to produce LNC sequels outside the 50 mile radius of downtown Chicago and that Quade's "Mother Superior" plays are LNC sequels are essentially moot. Notwithstanding the mootness of the collateral estoppel issue, Donovan and Defendants dispute whether the arbitrator's decision has preclusive effect on QDE's claim for diversion of corporate opportunity. Given the Court's finding below that the production and licensing of individually authored LNC sequels was not a corporate opportunity, it need not reach

this disputed issue.

**F.      Defendants' Motion to Bar Expert Testimony of David L. Garfinkle (Doc. 257)**

Defendants move to bar the expert testimony of David L. Garfinkle ("Garfinkle"), an attorney in the entertainment industry, who was retained to testify regarding a reasonable underlying rights payment for the use of the character "Sister" in LNC sequels. Defendants' motion (doc. 257) is denied.

Prior to trial, Defendants moved to strike Garfinkle's expert report for failing to meet Rule 26(a)(2)(B) and the requirements of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and to bar Garfinkle's testimony at trial. Doc. 199. The Court agreed that Garfinkle's report was deficient under Rule 26(a)(2)(B) but gave Donovan a chance to cure the deficiencies by paying the reasonable attorneys' fees associated with Defendants' counsel deposing Garfinkle to find out the reasons for his opinion. Doc. 229 at 3. Donovan's counsel conducted the deposition of Garfinkle at their office on the Saturday of Easter weekend, two days before trial. Defendants' counsel declined to attend Garfinkle's deposition before trial and when given an opportunity during the trial. Tr. 142-49. Defendants also declined to offer their own expert to testify about a reasonable royalty rate for underlying rights owners.

Defendants challenge Garfinkle's qualifications and the reliability of his opinion. Federal Rule of Evidence 702 governs the admissibility of expert testimony, as does the Supreme Court's <u>Daubert</u> decision. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. <u>Daubert</u> explains that the Federal Rules of Evidence "assign to the trial judge

the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. This "gatekeeping" role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). The purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152. Donovan bears the burden of demonstrating that Garfinkle's testimony satisfies the Daubert standard. Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009). While Daubert's requirements of reliability and relevancy apply in a bench trial, "the usual concerns of the rule–keeping unreliable expert testimony from the jury–are not present in such a setting." Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010).

Defendants first contest Garfinkle's qualifications. Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" as to matters involving "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Garfinkle is an attorney who has practiced entertainment law in the intellectual property departments of large and small law firms since 1988. Garfinkle Dep. at 4, 9, 19-20. In 1994, Garfinkle founded his own entertainment law firm. Id. at 20. Garfinkle's educational background includes an undergraduate degree from Duke University and a law degree from Boston University Law School. Id. Garfinkle has represented clients in the theater, film, television, music, publishing, and advertising industries. Id. at 5. Garfinkle has personal experience drafting or overseeing the drafting of rights acquisitions agreements for theater, including deals for theater producers acquiring underlying rights from original authors. Id. at 6. Garfinkle has also produced theatrical works and is the CEO of a theater production company that now produces the Broadway play Spiderman and a musical version of the movie Ghost, and that produced the musical The

Immigrant. Id. at 7-9. As a producer, Garfinkle is responsible for, among other things, acquiring the underlying rights from the original authors. Id. at 10. The Court finds that Garfinkle's extensive practical experience in the entertainment industry as an attorney and theater producer qualifies him as an expert on the issue of a standard royalty rate for underlying rights owners in the theater industry.

Defendants next argue that Garfinkle's opinion was not based on sufficient facts or data and that it was not the product of reliable methods. Donovan counters that Defendants' concerns relate to the weight, not the admissibility of Garfinkle's testimony, and that Defendants waived their chance to attack Garfinkle's testimony through cross-examination by declining to attend his deposition.

Garfinkle's testimony was sufficiently reliable. In reaching his conclusion about a standard theater industry underlying rights payment, Garfinkle relied on his over 20 years of personal experience in the entertainment industry as an attorney and theater producer. Garfinkle Dep. at 13. In his deposition, Garfinkle stated that an underlying rights payment is a payment made or a royalty paid to the author of a piece of work on which another new work is based. Id. at 10. Garfinkle testified that the standard in the theater industry is that the underlying rights owner's royalties are a third of the amount paid to the author. Id. at 11, 12-13. Garfinkle gave several examples of theater deals where the underlying rights payment was a third of the author's payment: the Araca Group shows on Broadway; *9:00 to 5:00*, a Broadway musical based on a movie; and MGM/UA theater deals from movies. Id. at 14-15. Garfinkle confirmed that his opinion regarding the standard royalty rate for underlying rights owners is generally accepted by others in the theater industry. Id. at 13; Kumho, 526 U.S. at 151 (stating "it will be at times useful to ask even a witness whose expertise is based purely on experience . . . whether his preparation is of a kind that others in the field would recognize as acceptable."). Garfinkle's experience is sufficiently reliable to develop an opinion about a theater industry standard royalty rate for underlying rights owners.

Without citing any authority, including any statement by an expert of their own, Defendants contend that Garfinkle's opinion is unreliable because his testimony focused on theater productions based on movies as opposed to sequels based on theatrical productions such as LNC. Defendants' challenge goes to the weight of Garfinkle's testimony, not its admissibility. The fact that some of Garfinkle's examples of the standard theater industry royalty rate for underlying rights owners were based on theater productions of movies is a proper subject for cross-examination and Defendants could have countered Garfinkle's examples with an expert of their own. Defendants also object that Garfinkle did not take into consideration any specific facts regarding LNC, including the fact that LNC and LNC sequels compete for the same audience; how much Donovan is paid by Entertainment Events to produce the derivative works including her consultant fee; and the fact that LNC sequels are often produced in offsite locations as opposed to on Broadway. These alleged shortcomings in Garfinkle's testimony are also proper subjects of cross-examination that go to the weight and not the admissibility of the testimony. Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) (stating "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

Garfinkle reliably applied his methodology and conclusion to the facts of the case. At his deposition, Garfinkle provided an example illustrating the one third formula as applied to the facts of this case. Garfinkle Dep. at 11. If the author of LNC2 received a royalty of 10% of box office receipts, the underlying authors (Donovan and Quade), would receive 3⅓% of box office receipts as underlying rights payments, which they would share according to their own agreement or if no agreement, share equally under copyright law as joint owners. Id.

In his report, Garfinkle opined that the underlying rights payment in this case would be between "one and three percent of 'gross weekly box receipts,' if there is no royalty rate paid, plus one and two percent of net profit." Doc. 258, Exh. A at 2. Defendants object to Garfinkle's

reasonable underlying rights opinion in his report on the grounds that it "has a completely different basis" than his testimony that the standard theater industry underlying rights royalty rate is one third of the author's payment. Garfinkle's report and testimony are sufficiently consistent regarding the standard underlying rights royalty rate. At his deposition, Garfinkle clarified that his report's reference to one to three percent of gross weekly box office receipts as a reasonable underlying rights rate was based on what the author usually gets paid by the producer. Garfinkle Dep. at 16-17. Garfinkle explained that the author's share of a production is typically six percent of the gross weekly box office receipts but can be as high as eight, nine or even ten percent. Id. Garfinkle added that the author "can always negotiate a little bit one way or the other off of that, depending on the strength of the underlying material." Id. at 17. Therefore, if six percent of gross weekly box office receipts is paid to the author, a third of six percent results in two percent of gross weekly box office receipts being paid to the underlying rights owner. One third of nine percent of gross weekly box receipts to the author results in three percent of gross weekly box receipts being paid to the underlying rights owner. Garfinkle's testimony of an underlying royalty rate of a third of the author's payment is the same formula as his report's statement that a reasonable underlying rights royalty would be between one and three percent of gross weekly box receipts.

Defendants next contend that Garfinkle's testimony of a theater industry standard underlying rights royalty rate is inadmissible because his testimony did not include a reference to the "net profits" term in his report and did not establish whether the "net profits" term in his report is applicable in this case. Donovan asserts that Garfinkle testified that the "net profits" portion of the standard formula applies when there are investors involved. Garfinkle Dep. at 17-18. Defendants are correct that no explanation exists for why Garfinkle included the "net profits" term in his report where this case does not involve investors. While Garfinkle and Donovan's counsel might have done a better job of providing an explanation for the purpose of including the "net profits" term in a non-investor case, that is not the test for admissibility. Again, Defendants'

criticism of this portion of the expert report does not mandate exclusion of Garfinkle's testimony because it does not completely undermine the reliability of his testimony. This perceived weakness should have been addressed through cross-examination or presentation of contrary evidence. Freeland v. Enodis Corp., 540 F.3d 721, 738 (7th Cir. 2008) (noting that inconsistencies between defendant's expert's report and his deposition testimony was an issue of credibility).

Defendants argue that Garfinkle did not reliably apply the standard royalty rate to this case because he did not clarify what the phrase "if there is no royalty paid" in his report refers to. The Court is not persuaded that this shortcoming renders Garfinkle's opinion unreliable and inadmissible. Defendants have not described how the meaning of this phrase might affect the accuracy or reliability of Garfinkle's expert opinion. It is reasonable to assume that the phrase "if there is no royalty paid" likely means if the producer has not agreed to pay the underlying rights owner's royalties directly, then the reasonable underlying rights payment from the derivative author to the underlying author is between one and three percent of gross weekly box receipts. To the extent Defendants believed the phrase affected Garfinkle's determination, Defendants were free to explore the issue on cross-examination.

Defendants also assert that Garfinkle's opinion is unreliable because he did not make a specific finding regarding the strength of LNC. Garfinkle testified that the strength of the original work can affect the royalty rate the derivative author can negotiate with the producer, which in turn would affect the total amount of money the underlying rights owner receives. Garfinkle did not testify that the strength of the original work affects the one third percentage figure the original author receives as an underlying rights payment. In this case, Donovan received ten percent of the net adjusted gross box office receipts as a royalty for Entertainment Events' professional presentations of Donovan's Sequels, which is at the top of the scale identified by Garfinkle and accounts for the success of LNC. Defs' Exh. 29 § 5(a); Defs' Exh. 30 § 5(a); Tr. 189, 329.

## II.     Findings of Fact

1. Donovan is a resident of the State of California.  Quade is a resident of the State of Illinois.  QDE is an Illinois corporation jointly and equally owned by Quade and Donovan.  Doc. 227, Exh. A, ¶¶ 1-3.

2. Donovan and Quade work in theater for a living.  Donovan is a playwright, a producer, and an actress.  Tr. 167.  Quade is a playwright, a producer, and a director.  Tr. 598.

3. In 1993, Donovan and Quade co-authored LNC, an audience-interactive comedic stage performance featuring a Roman Catholic nun named "Sister."  Tr. 601-06; Doc. 227, Exh. A, ¶ 6. LNC brings audience members back to their memories of growing up Catholic and attending Catholic schools.  Tr. 599.

4. LNC opened in Chicago, Illinois on May 29, 1993 at the Live Bait Theater.  Tr. 606.  The role of "Sister" in LNC was first played by Donovan.  Doc. 227, Exh. A, ¶ 7.  LNC was an immediate hit and received good reviews.  Tr. 607.  LNC has run continuously in Chicago since it opened.  Tr. 632.  Since 2000, LNC has run at the Royal George Theater in Chicago.  Tr. 632.

5. Beginning in 1993 when they wrote LNC together, Donovan and Quade were business partners.  Tr. 544-45.

6. On July 12, 1993, Donovan and Quade registered LNC as co-authors with the U.S. Copyright Office.  Doc. 227, Exh. A, ¶ 4.

7. From 1993 to the formation of QDE in 2000, Donovan and Quade registered various copyrights in LNC as co-authors.  Doc. 227, Exh. A, ¶ 5; Defs' Exhs. 23A-C, 23E-P.

8. On February 10, 1995, Donovan and Quade entered into a written agreement with Entertainment Events, a New York City production company, under which Entertainment Events was given the exclusive right to present LNC in all languages except French in certain venues outside of a fifty-mile radius of Chicago, Illinois in return for royalty payments to Donovan and

Quade.  Defs' Exh. 25 at ¶ 2.  The royalties were based on a percentage of the gross weekly box office receipts brought in by Entertainment Events' productions of LNC.  Defs' Exh. 25 at ¶ 5.

9. Donovan and Quade were always paid equal royalties from Entertainment Events' productions of LNC.  Tr. 612.

10. The parties understood at the time they signed the Entertainment Events Agreement in February 1995 that there might be a future play that featured the character "Sister" other than LNC.  Tr. 254; Defs' Exh. 25, ¶ 10.1.  Entertainment Events did not obtain any rights to any sequels to LNC in the original agreement with Donovan and Quade.  Section 10.1 of the original agreement required Donovan and Quade to seek Entertainment Events' permission to produce any derivative plays of LNC in Entertainment Events' territory.  Tr. 180; Defs' Exh. 25, ¶ 10.1.

11. In 1995, several individuals other than Donovan and Quade claimed they contributed to LNC and should share in the copyright.  Tr. 171.  Those individuals filed a lawsuit against Donovan and Quade.  Tr. 171.  Donovan testified that as a result of that lawsuit, Donovan and Quade's lawyer, Patsy Felch, recommended that Donovan and Quade prepare a written partnership agreement.  Tr. 172, 261-63.  Donovan testified that Attorney Felch drafted Defendants' Exhibit 24 ("the written partnership agreement") but made it look like Quade had written it.  Tr. 263-64.  Donovan stated that she and Quade intended to backdate the written partnership agreement and use it as a piece of evidence in the lawsuit.  Tr. 264.  Donovan disputes ever signing the written partnership agreement.  Tr. 264.  Donovan explained that the lawsuit settled, and the written partnership agreement was not shown to the other side or the court or thereafter used for any reason at any time.  Tr. 173, 264.

12. Quade testified that the written partnership agreement was not created for purposes of litigation.  Tr. 762.  Quade stated that in 1995, when Attorney Felch heard that Quade was working on drafting the sequel *More Late Nite Catechism*, Felch recommended that Donovan and Quade enter into a written partnership agreement.  Tr. 763.  Quade testified that Attorney Felch drafted

-18-

the written partnership agreement.  Tr. 764.  Quade testified that the written partnership agreement accurately reflects the business relationship she and Donovan had since 1993.  Tr. 767.

13. The written partnership agreement states that Donovan and Quade have created LNC, a play called *Room for Advancement*, and a script for the television series *Star Trek* together as writing partners.  Defs' Exh. 24.  The partnership agreement recognizes that Donovan and Quade "may also, in the future, create other plays or scripts together, or revise the works we have already created."  Defs' Exh. 24.  The partnership agreement provides that Donovan and Quade will "share equally in the ownership of these works, and any characters created in these works"; will "have joint control over their use"; and "will share equally in any benefits or expenses related to the use or licensing of these works or the characters we have created."  Defs' Exh. 24.

14. The written partnership agreement also states that it "does not pertain to any income that Vicki Quade or Maripat Donovan earn outside of our collaborative writing, or to any work that each of us does individually."  Defs' Exh. 24.

15. In 1995, Donovan and Quade co-authored a sequel to LNC called *More Late Nite Catechism*.  Tr. 617, 621.

16. Beginning in 1996 and continuing through 2000, Donovan and Quade filed business partnership income tax returns.  Pl's Exh. 34; Tr. 477-78.

17. From 1995 through 1999, Entertainment Events produced LNC in cities such as Boston, New York, Philadelphia, Toronto, Seattle, Portland, and New Orleans.  Donovan always opened the productions by playing the "Sister" character on stage.  Tr. 272, 622.  In addition to receiving her royalties as a playwright, Donovan was paid for being the actress in the productions in which she acted.  Tr. 272-73, 625.

18. In 1999, Timothy J. Flaherty ("Flaherty") took over control of Entertainment Events.  Tr. 623.

19. In 2000, Donovan's and Quade's tax accountant recommended that they establish a Subchapter S corporation to operate their ongoing business venture to minimize taxes and shield them from liabilities. Tr. 174, 433. In June 2000, Donovan and Quade formed QDE. Defs' Ex. 1.

20. QDE was incorporated strictly for tax savings. Tr. 433. Incorporation was not intended to change how Donovan's and Quade's business was run or owned. Tr. 434. The formation of QDE did not change the way Donovan and Quade ran the business together. Tr. 626. After the formation of QDE, Donovan and Quade continued to split LNC profits 50/50. Tr. 626. The formation of QDE did not change the way Donovan and Quade paid LNC expenses, booked LNC productions, or received royalties from Entertainment Events for LNC productions. Tr. 626-27, 731-32.

21. The articles incorporation and pre-incorporation subscription agreement for QDE state that QDE was incorporated for the "transaction of any or all lawful purposes for which corporations may be incorporated under the Illinois Business Corporation Act of 1983 . . . ." Defs' Exhs. 1, 2. This is standard language in articles of incorporation. Tr. 475-76; 805 ILCS 5/3.05. Donovan and Quade both signed the subscription agreement. Defs' Exh. 2.

22. The subscription agreement appoints Donovan and Quade as directors of QDE. Defs' Exh. 2. Donovan and Quade each own 50 percent of QDE and that ownership has remained the same at all times since its formation to the present. Doc. 96 at ¶ 23; Tr. 277. Since QDE's formation, Quade has served as President and Donovan has served as Secretary. Doc. 96 at ¶¶ 24, 25; Tr. 208, 626. Donovan and Quade understood that as shareholders, directors, and officers of QDE, they owed a fiduciary duty to each other and to the corporation. Tr. 379-80.

23. When QDE produced LNC during the early stages of the corporation's existence, Donovan and Quade shared in the profits by a ratio of 50-50 which is the same ratio by which they own the corporation. Tr. 175-76.

24. The copyright to LNC has never been assigned or transferred to QDE. Tr. 286, 704. The rights under the original agreement with Entertainment Events has never been assigned to QDE. Tr. 179. Because QDE was owned by Donovan and Quade, Donovan and Quade understood and agreed that QDE could produce LNC in Chicago, Milwaukee and California based on a permissive license. Tr. 287-88, 705.

25. QDE has always been and is currently in good standing with the State of Illinois. Tr. 471, 474. QDE has filed its annual report every year since its formation through 2010. Tr. 471–74; Defs' Exh. 4. QDE has never been formally dissolved with the Secretary of State. Tr. 462.

26. Beginning in 1999, Entertainment Events, under Flaherty's control, began producing LNC in Los Angeles. Doc. 96 at ¶ 31; Tr. 625. Donovan starred as "Sister" in the opening of the Los Angeles production of LNC. Tr. 625. Donovan then decided to move to the Los Angeles area permanently and has resided in California ever since. Tr. 167, 625.

27. On September 25, 2001, Entertainment Events entered into an agreement transferring the rights to produce LNC within Los Angeles plus a seventy-five mile surrounding radius to QDE (the "Los Angeles Agreement"). Defs' Exh. 27; Tr. 189, 627. The Los Angeles Agreement originally called for transfer of the Los Angeles rights to Donovan and Quade, but it was changed so that the rights were transferred to QDE. Defs' Exh. 27; Tr. 282-83. QDE sought these rights because Donovan had decided to live in California. Tr. 283.

28. Under the Los Angeles Agreement, the rights to produce in Los Angeles reverted back to Entertainment Events if QDE failed to produce the show in that territory for a 90-day period. Defs' Exh. 27 at § 1. Under Donovan's control, the Los Angeles branch of QDE produced LNC almost continuously in theaters and offsites, including sometimes running in three theaters at once. Tr. 190. Donovan testified, however, that the rights to produce LNC in Los Angeles reverted back to Entertainment Events because there was a 90-day time period when there were no productions of LNC. Tr. 190. Donovan testified that she did not remember exactly when the Los Angeles rights

reverted back to Entertainment Events.  Tr. 370.  The records Donovan produced show a 90-day break in LNC productions in Los Angeles from June 17, 2005 to October 15, 2005 and from February 1, 2007 to May 3, 2007.  Defs' Exh. 56 at 4.

29. Quade was never informed by either Entertainment Events or Donovan that the Los Angeles rights had reverted back to Entertainment Events because there had been a 90-day lapse in the production of LNC there.  Tr. 627.

30. After obtaining the rights to produce LNC in Los Angeles, QDE expanded into two regional branches: a Los Angeles branch operated by Donovan and a Chicago branch operated by Quade.  Tr. 285.  In 2003, QDE obtained rights to produce LNC in Milwaukee.  Defs' Exh. 28; Tr. 285-86.

31. Sometime during the summer of 2003, Donovan first told Quade of her intentions to write a sequel to LNC.  Tr. 664.

32. Beginning in 2003, Donovan wrote at least four LNC sequels, entitled: *Late Nite Catechism 2: Sometimes We Feel Guilty Because We Are Guilty* (LNC2) (2003); *Sister's Christmas Catechism–the Mystery of the Magi's Gold* (SCC) (2004); *Late Nite Catechism 3: 'Til Death Do Us Part* (2009); and *Sister's Easter Catechism: Will My Bunny Go to Heaven?* (2011) (collectively referred to as "Donovan's Sequels").  Tr. 218.  Donovan's Sequels all star the "Sister" character from LNC.  Defs' Exhs. 51-53.  The logistics, character, format and set-up of Donovan's Sequels are identical to that of LNC.  Defs' Exhs. 51-53; Tr. 679.  Quade did not contribute to the authoring of Donovan's Sequels.  Tr. 218, 680.  Donovan did not offer Quade or QDE the opportunity to participate in the process of writing, licensing, or producing LNC2.  Tr. 329, 334-45, 680.

33. Quade testified that in December 2003, she learned that LNC2 was being produced by Entertainment Events in California.  Tr. 678.

34. In January 2004, Donovan formed a new corporation, Donovan Entertainment, Inc. ("Donovan, Inc.").  Defs' Exh. 15; Doc. 96 at ¶ 52.  Donovan is the sole owner of Donovan, Inc.  Tr.

465-66.  Donovan did not offer Quade or QDE the opportunity to participate in Donovan, Inc.  Tr. 319.

35. In 2004, Donovan entered into negotiations with Entertainment Events regarding the rights to produce Donovan's Sequels (the sequels then existing were LNC2 and SCC).  Tr. 184-87.

36.  During negotiations, two draft Memorandum of Understanding were prepared that provided the general framework for the relationship that Donovan and Entertainment Events had with respect to Donovan's Sequels in April 2004.  Tr. 328.  One Memorandum of Understanding dated April 28, 2004 related to LNC2 as well as some provisions relating to the original LNC.  Defs' Exh. 29.  The other Memorandum of Understanding also dated April 28, 2004 related to SCC. Defs' Exh. 30.

37. The two draft Memorandum of Understanding were never signed by Donovan and Entertainment Events.  Tr. 184-85, 328.

38. The draft Memoranda of Understanding, included the following terms and conditions:

- Donovan granted Entertainment Events the exclusive rights to produce LNC2 and SCC anywhere in the United States except in the State of California, the city of Chicago region, and the city of Seattle plus 100 miles (in those areas Donovan kept the rights to herself). Defs' Exh. 29 §§ 1, 2(a).

- Donovan received a 10% royalty of the net adjusted gross box office receipts for Entertainment Events' professional presentations of LNC2 and SCC as an author's royalty.  Defs' Exh. 29 § 5(a); Defs' Exh. 30 § 5(a); Tr. 189, 329.

- Donovan initially received an additional 10% of Entertainment Events' gross receipts minus certain expenses as a consulting fee. Defs' Exh. 29 § 6; Defs' Exh. 30 § 6; Tr. 185, 329-30.

- Donovan could produce LNC2 and SCC in the California, Chicago, and Seattle regions and must pay Entertainment Events a royalty for those productions.  Defs' Exh. 29 § 8; Defs' Exh. 30 § 8; Tr. 186-87.

39. One of the draft Memorandum of Understanding contains a provision attempting to make Donovan the exclusive producer of LNC in California and Chicago, even though QDE

obtained the rights to produce in Los Angeles in 2001 and Donovan has always had to share rights to LNC in Chicago with Quade. Defs' Exh. 29 § 2A; Tr. 343-44.

40. Donovan entered into similar agreements with Entertainment Events with respect to her other LNC sequels, LNC3 and Sister's Easter Catechism. Defs' Exhs. 31, 32. Entertainment Events produces all of Donovan's Sequels. Defs' Exhs. 32; Defs' Exh. 42 at 20-21; Tr. 405. QDE was never given the chance to produce Donovan's Sequels. Tr. 695. Entertainment Events' first production of LNC2 took place at least as early as March 7, 2004. Defs' Exh. 32 at 1.

41. With respect to Entertainment Events' productions of LNC2, Donovan never gave any portion of the royalties that she earned from those productions to Quade or QDE. Tr. 331, 386. Quade never received any royalties from Entertainment Events for its productions of Donovan's Sequels. Tr. 687. The only play Quade receives royalties from Entertainment Events is LNC. Tr. 687.

42. Entertainment Events pays less royalties for LNC productions than it does for productions of Donovan's Sequels. Tr. 732. Since 2004, Entertainment Events has gradually increased the frequency in which it produces Donovan's Sequels and has gradually decreased the frequency in which it produces LNC. Defs' Exh. 104A.

43. With respect to the productions of Donovan's Sequels that were produced by Donovan (through Donovan, Inc.), Donovan has not shared any of the proceeds or profits that she received from Donovan's Sequels with Quade or QDE. Tr. 335, 694-95. Donovan paid a royalty to Entertainment Events for those productions but did not pay any royalty to Quade. Donovan stated that she assumed Entertainment Events would share its royalty with Quade. Tr. 187-88. When Donovan produced Donovan's Sequels, she did so through Donovan Inc., not through QDE. Tr. 372.

44. In 2005, Quade began writing her own nun sequel plays that are derived from LNC. Tr. 688. In 2005, Quade authored and began producing *Put the Nuns in Charge!* (PNC). Tr. 688. Quade has also wrote three other LNC sequels, *Sunday School Cinema* (SSC) (2007), *Saints & Sinners* (S&S) (2009), and *Mother Superior's Ho-Ho-Holy Night* (MSHN) (2009) ("Quade's Sequels"). Tr. 690. Donovan did not contribute to the authoring of Quade's Sequels. Quade produced Quade's Sequels through QDE and her own theatrical production company called Nuns4Fun, Inc. ("Nuns4Fun"). Tr. 57, 372, 690-91, 757-58. Quade has not paid any royalties to Donovan from her production of Quade's Sequels. Tr. 733.

45. Entertainment Events offered to produce Quade's PNC subject to certain requirements that Quade was unwilling to agree to. Tr. 689. Flaherty told Quade that Entertainment Events would produce PNC if Donovan approved the script, if Donovan's name was put on the script, and if Donovan was paid half the royalties. Tr. 689-90. When Entertainment Events negotiated for the rights to produce Donovan's Sequels, Quade was not asked for her approval of Donovan's Sequels, was not asked to include her name on the script to Donovan's Sequels, and was not given royalties for productions of Donovan's Sequels. Tr. 687, 691, 694. Entertainment Events has never produced any of Quade's Sequels. Tr. 690

46. In June 2005, Donovan filed this lawsuit against Quade, originally seeking to enjoin production of PNC. Doc. 1; Tr. 688-89. By agreement of the parties, Quade agreed to cease and desist using advertisements containing the "Sister" caricature and to change the name of the production company identified as producing PNC to remove any reference to Donovan. Doc. 7. The district court denied Donovan's request for a temporary restraining order. Doc. 7.

47. QDE Chicago produces LNC in two types of venues: theaters and offsites which are produced in schools or churches and are usually one-night performances. Tr. 59-60, 628-29. It is very uncommon for an offsite performance not to be profitable. Tr. 61. Typically, offsites

generate $3,000 per show.  Tr. 155-56.  Other than charitable events, the profits that Quade would make on offsites would be between $1,800 and $2,300 per show.  Tr. 713.

48.  The typical expenses for offsite productions made by the Chicago branch of QDE include:  Actress:  $200-$250 per show; Stage Manager:  $200-$250 per show; and Director:  $100 per show.  Tr. 60, 630.  The typical expenses for productions of LNC at the Royal George Theater include:  Rent: $2,000/week; Actress: $200 per show; Stage Manager: $100 per show.  Tr. 631-33. The two biggest expenses for QDE operations in Chicago are rent to the Royal George Theater and advertising.  Tr. 640.  Additional expenses for the Chicago branch of QDE may include booking fees, group sales fees, and other administrative expenses.  *See infra* ¶¶ 49, 51; Defs' Exh. 5 at ROS-Q/D24.  Based on the foregoing, it is a reasonable estimate that a typical production of LNC, whether a theater production or offsite, incurs approximately $1,000 of expenses per production.

49.  In 2003, Quade began paying herself fees related to the LNC bookings she made in Chicago.  Tr. 89, 156.  Quade handled bookings for the Chicago office by making phone calls and sending out post cards and mailings.  Tr. 630-31.  When a booking fee was charged, it was for $250 and Quade received it.  Tr. 631.  Quade testified that she has not received a LNC booking fee since 2007.  Tr. 748.

50.  Quade operates QDE's Chicago branch out of her condominium, and QDE pays Quade rent.  Tr. 86.  The rent for the QDE Chicago office was $1,000 per month and then increased to $1,200 per month.  Tr. 157-58.

51.  Since LNC opened at the Royal George Theater in Chicago, group sales were done by Quade.  Tr. 89.  Beginning in 2002 or 2003, Quade began selling groups for LNC and other plays at the Royal George Theater through a corporation she formed called Chicago Group Sales.  Tr. 89, 693-94.  Chicago Group Sales does not produce plays.  Tr. 694.  Chicago Group Sales takes a group sales fee of 10 percent of the total value of the tickets sold as the group sales commission. Tr. 92-93.  Fees paid to Chicago Group Sales for LNC are shared with QDE.  Tr. 694.  Quade

testified that she has not received a group sales fee for LNC since 2007.  Tr. 748.

52. There are two types of venues where Donovan produces LNC and sequels in California: theaters and offsites.  The typical expenses for offsite productions made by Donovan include: Actress:  $300-400 per show ; Stage Manager: $250 per show; and Set Manager: $200 per show.  Tr. 567-71.  The typical expenses for theatrical productions are similar except there may also be expenses related to a house manager, advertising, a driver, meals and per diem costs, ticket fees, and a payment to the theater, and the royalty payment to Entertainment Events.  Tr. 567-71.  Based on the foregoing, a reasonable estimate for expenses for productions of LNC and LNC sequels in California, whether a theater production or an offsite, is approximately $1,000 of expenses per show.

53. The Los Angeles branch of QDE paid booking fees of $250 per show.  Tr. 322.  The booking fee in Chicago is the same as in California.  Tr. 323-24.  No booking fees were paid to Donovan personally.  Tr. 521.  In Los Angeles, the booking fees were paid to third parties who were hired to make the bookings.  Tr. 89-90.

54. QDE paid $1,000 per month in rent to Donovan for office space in California because Quade charged similar rent for QDE office space in Chicago.  Tr. 226-67, 321.  Donovan, Inc. and QDE Los Angeles shared office space in California.  Tr. at 319.  There is no written lease for Donovan, Inc. office space.  Tr. 320.

55. In Los Angeles, group sales were handled pursuant to an agreement with an agent.  Tr. 89.  Group sales made in California for LNC productions are discounted 10 percent, the same discount as in Chicago.  Tr. 326.

56. After 2003, other than the reported reasonable compensation to officers of an S Corporation, there was no cash-in-hand salary paid to the officers of QDE.  Tr. 433, 749-50.  Quade maintains (and there was no evidence otherwise) that prior to 2004, she split the profits generated by the productions of LNC produced by the Chicago branch of QDE on a 50-50 basis

-27-

between Donovan and Quade. Tr. 71, 175-76, 191, 636-68. Prior to 2003, Quade prepared reports showing the per-show profit details which accompanied the profit checks sent to Donovan. Defs' Exh. 45 at 14-16; Tr. 638. Quade testified that in 2003, she stopped preparing the per-show financial reports because Royal George Theater expenses exceeded remaining profits. Tr. 639. Except for $14,506 profit in 2006, all years from 2004-2009 were unprofitable for QDE Chicago. Tr. 640-41.

57. The annual net income of the Chicago branch of QDE was as follows:

| Year | Annual Net Income of QDE Chicago |
|------|----------------------------------|
| 2002 | profit of $211,421.25 |
| 2003 | profit of $118,814.26 |
| 2004 | loss of $19,519.58 |
| 2005 | loss of $7,093.55 |
| 2006 | profit of $14,506.23 |
| 2007 | loss of $11,495.33 |
| 2008 | loss of $2,407.59 |
| 2009 | loss of $33,536.88 |

Defs' Exh. 5 at ROS-Q/D765, ROS-Q/D479, ROS-Q/D225, ROS-Q/D23; Plaintiff's Exh. 23 at 7, 23; Defs' Exh. 61 at 8; Defs' Exh. 62 at 8.

58. Quade Productions is an entity that Quade owns which she uses to produce plays which are not co-authored by either herself or Donovan. Tr. 693. The revenue earned by Quade Productions is not shared with QDE. Tr. 693.

59. Nuns4Fun is a corporation that Quade created in 2009 to produce Quade's Sequels in schools or churches outside of the Chicago region. Tr. 57, 691-92. Quade's Sequels that were produced outside of the Chicago region featured a nun named "Mother Superior," instead of "Sister"–a change that was the result of an arbitration ruling between Quade and Entertainment

Events.  Tr. 691-92, 753-54.  Quade testified that revenue earned by Nuns4Fun has been used to pay the expenses of QDE.  Tr. 691-92.

60. Hal Roseth ("Roseth") is the accountant for the Chicago and Los Angeles branches of QDE.  Tr. 62, 441-43.  Roseth is also the accountant for Quade Productions and Nuns4Fun, and he prepares Quade's personal income taxes.  Tr. 62, 514-15.

61. Roseth has been a certified public accountant for 18 years and has been with his current firm for the last 13 years.  Tr. 431.  Roseth has been working for Donovan and Quade since 1998 or 1999 when he first partnered up with his colleague, Scott Cohen.  Tr. 431.  At that time, Roseth knew that Donovan and Quade were a partnership based on the files and records and tax returns filed in the past.  Tr. 431.  Under the partnership, profits were split between Donovan and Quade on a 50-50 basis.  Tr. 431-42.  Roseth began preparing tax returns for QDE in 2000, when it was incorporated.  Tr. 64, 432.

62. As QDE's accountant, Roseth's firm prepared financial statements, balance sheets, income statements, profit and loss statements, general ledgers, and then annually tax returns.  Tr. 436.  QDE provided its financial information to Roseth by sending him bank statements, copies of checks, and Quickbook reports for income and expenses.  Tr. 161.  Roseth then reconciled the information provided by QDE with the bank statements for accuracy.  Tr. 483.  Roseth prepared financial statements for QDE monthly or quarterly in addition to annual reports.  Tr. 437-38.

63. Prior to 2002, Roseth would send the financial reports to Quade in Chicago.  Tr. 488.  When Donovan began producing LNC in Los Angeles, Donovan requested that Roseth provide her copies of the QDE financial statements.  Tr. 288, 454.  Donovan has never made a request for the financial statements that Roseth did not honor, and Donovan had access to them at any point in time.  Tr. 288-89.  Since 2002, Roseth has always provided LA financial statements to Donovan on an interim basis and tried to provide both Chicago and LA statements simultaneously.  Tr. 454, 488.

64. The financial statements disclose the income generated and various expenses incurred by QDE, broken down between the Chicago branch and Los Angeles branch. Defs' Exh. 5 at ROS-Q/D23-26. The expenses disclosed in the financial statements include, among other expenses: salary to officers, payroll to others, rent, advertising, show expenses, commissions, royalty fees, outside services, costumes and props, office supplies, ticket sales fees, professional fees, bank and credit card charges, taxes, and other expenses. Defs' Exh. 5 at ROS-Q/D23-26. Roseth wrote in 2005 and agrees today that neither the Chicago or Los Angeles operation has ever hid transactions or attempted to call distributions of corporate assets something other than what they truly were. Tr. 458; Defs' Exh. 41BB.

65. When Donovan first saw the 2002 QDE financial reports, she realized that salary paid out in Chicago to Quade was multiples of what Donovan was paid out in Los Angeles. Tr. 489. This led to a series of emails exchanged between Donovan and Quade in January and February 2003 and an impasse on certain issues affecting the functioning of QDE. Tr. 462-63; Defs' Exh. 41C-N. Roseth confirmed that during the early part of 2003, Donovan and Quade "had a very severe falling out." Tr. 496.

66. On June 6, 2003, Donovan and Quade met with Roseth in an attempt to resolve the disputes they were having. Roseth served as mediator. Tr. 308. During the meeting, Donovan and Quade reached "a lot of agreements." Tr. 463. After the meeting, Roseth wrote a letter memorializing Donovan and Quade's agreements (Defs' Exh. 41P), which included the following:

A.  Donovan and Quade agreed to resolve the salary dispute by paying Donovan an amount to get "caught up" to the amount Quade had been already paid. Tr. 199. Donovan received $46,000 in additional distributions. Tr. 539-43.

B.  Since it was a 50-50 partnership, they agreed that important decisions should be made together. Tr. 463.

C.  Donovan and Quade agreed that they would discuss the use of any LNC concepts, ideas, symbols and properties outside of actual performances of LNC.

-30-

D. Moving forward, there would be no profits paid out as performances were completed on a per show/run basis. Instead, the profits were to be commingled from venues as well as offsites, then after all general and administrative expenses were paid (including salaries) the profits were to be distributed equally. Tr. 647-48.

67. As a result of the June 2003 agreements, Quade stopped creating financial reports to Donovan based on a per show or per run basis pursuant to Roseth's instruction to commingle funds. Tr. 648. Profits would only be paid out at the end of the year, after all the bills were paid. Tr. 648. Quade testified that she never decided not to share any profits with Donovan. There were no profits from the Chicago branch of QDE after 2003. Tr. 648.

68. Despite reaching certain agreements with the aid of Roseth in June 2003, Donovan and Quade continued to have serious disagreements. Defs' Exh. 41(Q)-(AA). In 2003, Donovan and Quade began treating QDE Chicago and QDE Los Angeles as two separate entities and stopped engaging in any joint-decision-making regarding the corporation. Tr. 502-03.

69. The annual net income of the Los Angeles branch of QDE was as follows:

| Year | Annual Net Income: QDE (Los Angeles) |
|:---:|:---:|
| 2002 | profit of $109,969.18 |
| 2003 | profit of $171,199.95 |
| 2004 | profit of $219,903.86 |
| 2005 | profit of $5,335.92 |
| 2006 | profit of $7,897.19 |
| 2007 | profit of $9,060.00 |
| 2008 | profit of $19,000.00 |
| 2009 | loss of $980.19 |

Defs' Exh. 5 at ROS-Q/D767, ROS-Q/D481, ROS-Q/D227, ROS-Q/D25; Pl's Exh. 23 at 9, 24; Defs' Exh. 61 at 9; Defs' Exh. 62 at 9.

70. The profits generated by the Los Angeles branch of QDE from 2004 to 2009 totaled approximately $260,215. Defs' Exh. 5 at ROS-Q/D227, ROS-Q/D25; Pl's Exh. 23 at 9, 24; Defs' Exh. 61 at 9; Defs' Exh. 62 at 9. In 2004, Donovan distributed $182,000 of profit between herself and Quade, sending $91,000 to Quade. Pl's Exh. 35; Tr. 195. Donovan essentially stopped sending profit checks from the Los Angeles office of QDE to Quade in November 2004. Tr. at 193, 643. The last payment from Donovan to Quade for QDE's production of LNC in California was for $4,000 by checked dated November 23, 2004. Tr. 193-95; Pl's Exh. 35. The $260,215 in profits generated from 2004 to 2009 by the Los Angeles office of QDE, less the $182,000 distributed to Donovan and Quade left a remainder in the amount of $78,215. At trial, Donovan could not explain where the remainder of the $78,215 in profit went. Tr. 566-67. Donovan was required to evenly split the remaining profits of $78,215 with Quade. As set forth below, Quade's recovery of her portion of undistributed profits earned by the Los Angeles branch of QDE between the end of 2004 through 2009 will be based on the contracts produced by Donovan rather than awarding Quade half of $78,215. Quade is not entitled to half of $78,215 in addition to a recovery based on the contracts because that would create a double recovery to which she is not entitled.

71. Donovan was making money through her own production of LNC through QDE in Chicago in 2008 and 2009. Tr. 354-57. Donovan testified that in 2008 and 2009, she focused all of her attention on Donovan Entertainment rather than QDE. Tr. 556.

72. Defendants' Exhibit 36 (summarized in Defendants' Exhibit 56, pages 1-5) contains a compilation of the produced contracts for Donovan's productions (through QDE and Donovan, Inc.) of LNC in California. Defs' Exh. 36; Tr. 284, 393. Donovan began producing LNC in California on April 27, 2002 through QDE. Defs' Exh. 56 at 1. By contract dated April19, 2004 for a performance on September 11, 2004, Donovan began producing LNC in California through Donovan, Inc. as well as QDE. Defs' Exh. 36 at 188. Between September 11, 2004 and November 19, 2004, Donovan produced LNC 5 times on behalf of Donovan, Inc. and generated $20,000 in

revenue for these 5 shows.  Defs' Exh. 36 at 188-89, 194-95, 198-99, 204-05, 216-17; Defs' Exh. 56 at 3.  Assuming $1,000 in expenses per show, the profits generated were $15,000.  *See supra* ¶¶ 48, 52.  Donovan did not share any of the revenues or profits she generated from these 5 productions of LNC by Donovan, Inc. with Quade.  Tr. 404-05.

73. From December 4, 2004 through November 13, 2009, Donovan produced LNC at least 77 times in California on behalf of QDE and Donovan, Inc.  Defs' Exh. 56 at 3-5.  Donovan generated $231,580 in revenue for these 77 shows.  Defs' Exh. 56 at 3-5.  Assuming $1,000 in expenses per show, the profits generated were $154,580.  *See supra* ¶¶ 48, 52.  Since November 24, 2004, Donovan has not shared any of the revenues or profits she generated for her production of LNC in California with Quade.  Pl's Exh. 35; Tr. 193-95, 404-05.

74. Since November 13, 2009, Donovan has continued to produce LNC in California through Donovan, Inc. but the financial information has not been accounted for.  Defs' Exh. 56 at 5.

75.  Defendants' Exhibit 37 (summarized in Defendants' Exhibit 56 at page 6) is a compilation of the produced contracts for Donovan's productions (through QDE and Donovan, Inc.) of LNC in the Chicago region.  Quade believes Donovan, Inc. has been operating in Chicago since 2004.  Tr. 651.  The first produced contract for a LNC show by Donovan in Chicago is dated October 15, 2004 for a performance on January 28, 2005.  Defs' Exh. 37 at 1; Defs' Exh. 56 at 6.  By contract dated March 21, 2006 for a performance on November 18, 2006, Donovan began producing LNC in the Chicago region through Donovan, Inc. as well as QDE.  Defs' Exh. 37 at 16-48.  From January 28, 2005 through September 19, 2009, Donovan produced LNC at least 21 times in the Chicago region on behalf of QDE and Donovan, Inc.  Defs' Exh. 56 at 6.  Donovan generated $59,990 in revenue for these 21 shows.  Defs' Exh. 56 at 6.  Assuming $1,000 in expenses for these offsite shows, the profits generated were $38,990.  *See supra* ¶¶ 48, 52.  Donovan has not shared any of the revenues or profits she generated for her production of LNC

in Chicago with Quade.  Pl's Exh. 35; Tr. 193-95.

76. Donovan has continued to produce LNC in Chicago but the financial information for shows since September 19, 2009 has not been accounted for.  Defs' Exh. 56 at 6.

77. Donovan, Inc. competes with QDE by producing offsites of LNC and Donovan's Sequels in Chicago.  Defs' Exhs. 55, 56; Tr. 649-51.  Donovan, Inc.'s Chicago bookings affect QDE's Chicago bookings by diverting income and diminishing marketing ability.  Tr. 654-55.

78. Defendants' Exhibit 35 (summarized in Defendants' Exhibit 55) is compilation of the produced contracts for Donovan's productions of Donovan's Sequels in California, the Chicago region, and the Seattle region.  Defs' Exh. 35; Tr. 387-89.

79. Donovan began producing Donovan's Sequels in or about September 2004.  Defs' Exh. 55 at 1.  Donovan has always produced Donovan's sequels through Donovan, Inc. and not through QDE.  Defs' Exh. 35.  From September 12, 2004 through February 27, 2010, Donovan produced Donovan's Sequels at least 424 times in California, Chicago, and Seattle.  Defs' Exh. 55.  Donovan generated $1,533,823 in revenue for these 424 shows.  Defs' Exh. 55.  Donovan did not share any of the $1.5 million in revenue from her productions of Donovan's Sequels with Quade or QDE.  Tr. 335, 390-92, 694-95.

80. Donovan has continued to produce Donovan's Sequels through Donovan, Inc. but the financial information for shows since February 27, 2010 has not been accounted for.  Defs' Exh. 55; Tr. 404.

81. Defendants' Exhibit 32 (summarized in Defendants' Exhibit 54) is a compilation of the produced royalty statements sent from Entertainment Events to Donovan for productions of Donovan's Sequels.  Tr. at 383.  On the royalty statements, Donovan received the amount listed as "total enclosed," which included both author royalties and consulting fees.  Defs' Exh. 32; Tr. 224.  Donovan did not incur any expenses in obtaining these royalties.  Tr. 384.

82. Between March 2004 and March 2010, Donovan has received payments totaling $1,156,760 from the performances of Donovan's Sequels produced by Entertainment Events. Defs' Exhs. 32, 54. Donovan has continued to receive royalties from Entertainment Events since March 2010, but the financial information regarding Donovan's royalties received since March 2010 has not been accounted for. Tr. 383-84. Donovan also anticipates receiving royalties from Entertainment Events' productions of her most recent sequel, *Sister's Easter Catechism*, but those royalty statements have also not been accounted for. Tr. 405-06. Donovan did not share with Quade or QDE the royalties that she received from Entertainment Events for its production of Donovan's Sequels. Tr. 331, 335, 386, 694-95.

83. For the past several years, Quade has been a party in an arbitration proceeding against Entertainment Events, Case No. 13 140 Y 00169 07, before the American Arbitration Association On February 22, 2011, the arbitrator issued his award. Pl's Exh. 33. The arbitrator awarded Entertainment Events $848,196 from Quade less an adjustment for certain royalties withheld by Entertainment Events. Pl's Exh. 33. A motion to vacate the arbitration award is currently pending in the New York County Supreme Court, Commercial Division. Doc. 263 at 1.

## III. Conclusions of Law

### A. Donovan's Claims

84. The Court previously granted summary judgment in favor of Quade and against Donovan on Counts I and II of Donovan's Amended Complaint. Doc. 151. Donovan's remaining claims are for accounting (Count III), breach of fiduciary duty (Count IV), and removal of Quade as corporate officer/director (Count V). Donovan did not sufficiently advance theories of accounting or breach of fiduciary duty in her proposed Conclusions of Law. Her one sentence reference to Counts III and IV on pages 3 and 24 at footnote 24 without any analysis is not adequate to preserve these claims. Donovan's failure to pursue these two counts in her proposed Conclusions

of Law amounts to an abandonment of those claims.

85. As to Count V, Donovan argues in her proposed Conclusions of Law that QDE should be dissolved *nunc pro tunc* to June 2003 under Section 12.56(b)(12) of the Illinois Business Corporation Act (IBCA).  805 ILCS 5/12.56.  Quade responds that Donovan's dissolution request should not be considered because it was never plead in this case.

86. Donovan began this litigation with a complaint to remove Quade as an officer of QDE. Donovan's pleadings were never formally amended to include her claim for dissolution but her claim for dissolution of QDE was included in the final pretrial order.  In the final pretrial order, Donovan requested, among other things, "[t]he removal of Victoria Quade as an officer of Quade/Donovan Entertainment, Inc. and/or the dissolution of Quade/Donovan Entertainment, Inc."  Doc. 207 at 25; Doc. 227 at 26.  Donovan's trial brief also include a claim for dissolution of QDE.  Doc. 220 at 3-4. Under these circumstances, the Court can address Donovan's claim for dissolution of QDE.  See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 474 (2007) (holding that a final pretrial order supersedes all prior pleadings and "control[s] the subsequent course of the action."); Erff v. MarkHon Industries, Inc., 781 F.2d 613, 617 (7th Cir. 1986) (stating "the pre-trial order is treated as superseding the pleadings and establishes the issues to be considered at trial.").

87. Under the judicial dissolution provisions of the IBCA, a court may order the dissolution of a non-public corporation in an action by a shareholder if other remedies are insufficient to resolve the matters in dispute if it is established that:

> (a) The directors are deadlocked, whether because of even division in the number of directors . . ., in the management of the corporate affairs; the shareholders are unable to break the deadlock; and either irreparable injury to the corporation is thereby caused or threatened or the business of the corporation can no longer be conducted to the general advantage of the shareholders; or

> (b) The shareholders are deadlocked in voting power and have failed, for a period that includes at lease 2 consecutive annual meeting dates, to elect successors to directors whose terms have expired and either irreparable injury to the corporation is thereby caused or threatened or the business of the corporation can no longer be conducted to the general advantage of the shareholders; or

(c) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer; or

(d) The corporation assets are being misapplied or wasted.

805 ILCS 5/12.56.

88. Donovan appears to contend that all four grounds for dissolution are present here. Doc. 84, Count V. Defendants argue that the evidence does not establish any of the grounds for the drastic remedy of dissolution of a corporation. The Court disagrees and concludes that dissolution of QDE is justified.

89. The evidence at trial was sufficient to prove a deadlock in the management of QDE. Donovan and Quade incorporated QDE in 2000. They were and are the sole directors, officers, and shareholders. The actions of both directors have created a corporate deadlock in the management of the corporate affairs. Because of the even division of shares and even number of directors, the shareholders cannot break the deadlock in management of the corporation.

90. The impasse among the directors began in 2003 when Donovan discovered that Quade had paid herself $1,000 per week as salary (instead of the $250 per week Donovan thought they have agreed to) without consulting Donovan. By early 2003, the day-to-day oversight and management of the Los Angeles branch of QDE was exclusively handled by Donovan while the day-to-day oversight and management of the Chicago branch of QDE was handled exclusively by Quade. Relations between Donovan and Quade continued to worsen. During the 2003-2004 time frame, Donovan and Quade had many heated differences and disputes between them, including Donovan's disapproval of use of the large theater in Naperville, Illinois which Quade co-owned for LNC shows; Quade's hiring a new director and actress in Chicago without consulting Donovan or Marc Silvia (their director of five years); Quade paying herself $250 per offsite as a booking fee; the Los Angeles office manager's pay; the lack of weekly box office reports from the Milwaukee

productions of LNC; and the lack of profits from Chicago, Naperville, and Milwaukee LNC productions. Defs' Exh. 41 C-AA. In late 2003, Donovan and Quade deadlocked over the issue of underlying rights payments for individually authored LNC sequels. Since 2003, each party has exclusively managed different branches of QDE's operations.

91. By 2005, there was no meaningful interaction or communication between Donovan and Quade. Tr. 737. Given this impasse, Donovan and Quade have operated the two branches of QDE as if they were separate corporations. Under this arrangement, Donovan has had no say in QDE's operations in Chicago and Quade has had no say in QDE's operations in Los Angeles. This litigation which began in June 2005 has included accusations of forgery, mismanagement of the Chicago branch and misapplication of its assets, fiduciary duty violations, and failure to properly account for profits and royalties.

92. Donovan and Quade have also acted in a manner that is oppressive toward the other one and there is no hope that conduct will change. Gidwitz v. Lanzit Corrugated Box Co., 170 N.E.2d 131, 135 (Ill. S.Ct. 1960) (holding oppressive conduct does not require proof of illegal or fraudulent acts, mismanaged or misapplied assets, or disaster that is imminent). "A continuing course of conduct which is 'overbearing and heavy-handed' can be sufficient to demonstrate oppression." Allen v. Park National Bank and Trust of Chicago, 1998 WL 299477, at *5 (N.D. Ill. May 29, 1998). Donovan and Quade have engaged in oppressive behavior by operating their respective branches of QDE and making decisions on behalf of their respective branches without seeking assent or assistance from the other. Donovan has excluded Quade from participation in the business and income of the Los Angeles branch of QDE. Donovan assumed full control over the Los Angeles branch without discussing with Quade any action taken by her on behalf of QDE. Quade has excluded Donovan from participation in the business of the Chicago branch of QDE. Quade assumed full control over the Chicago branch without discussing with Donovan any action taken by her on behalf of QDE. As a result, Donovan has been deprived of her right to participate

in the management of the Chicago branch of QDE, and Quade has been deprived of her right to participate in the management of the Los Angeles branch of QDE. It has been impracticable for either party to carry on business with the other.

93. The drastic remedy of dissolution is warranted here. Because of the parties' distrust, noncommunication, and inability to continue harmoniously the affairs of QDE, it is not practicable to carry on the business of QDE. The high level of animosity the parties hold for each other has divided the management and operation of the corporation. There has been no joint decision-making since prior to 2003. The directors/shareholders have gone without meetings. The distribution of profits and royalties has gone unsettled. The deadlock has prevented Donovan and Quade from operating the Chicago branch at a profit. Except for approximately $14,000 profit in 2006, the Chicago branch of QDE has not been profitable since 2003. Donovan has not benefitted financially from Quade's operation of the Chicago branch of QDE since 2003. After 2003, only Quade has received benefits from the Chicago branch of QDE in the form of booking fees and group sales fees related to LNC and rent for operation of QDE's Chicago branch out of her condominium. Quade blames the Chicago branch's unprofitability on Donovan competing with QDE's production of LNC shows in Chicago and the economy, but there was no evidence that the Chicago branch of QDE could reasonably generate a profit in the future. The dissatisfaction and dissension among Donovan and Quade has been so long and bitter than any prior harmony and trust cannot be reestablished. The parties' differences are irreconcilable. Given this relationship between Donovan and Quade, the business and affairs of QDE cannot be operated to the advantage of all shareholders.

94. In light of these circumstances, dissolution is equitable and the only practical solution. The Court finds that the management deadlock coupled with the evidence of oppression supports a finding that other statutory remedies (805 ILCS 5/12.56(b)(1)-(11)) and other alternative remedies are insufficient to resolve the matters in dispute.

95. As for Donovan's request that Court dissolve QDE *nunc pro tunc* to June 2003, she has cited no authority under which this Court has the power to dissolve a corporation *nunc pro tunc* to a prior date. In the absence of authority, the Court denies Donovan's request. Moreover, QDE filed articles of incorporation, paid taxes, and was a corporation in good standing with the Secretary of State's Office as of the date of the trial.

## B.    Quade's and QDE's Counterclaims

96. Quade and QDE have four counterclaims against Donovan: (1) breach of contract (partnership agreement) (Count I); (2) deprivation of copyright revenues (Count II); (3) diversion of corporate opportunity (Count III); and (4) accounting (Count V).

### 1.    Breach of Contract (Partnership Agreement) (Count I)

97. Quade contends that Donovan breached her obligations under the parties' 1995 written partnership agreement (Defendants' Exhibit 24) by keeping all of the revenues and profits generated by Donovan's Sequels for herself, rather than sharing those benefits equally as she had agreed to do. Doc. 225 at 6; Tr. 840-41. Donovan argues that the written partnership agreement is not valid and that its terms do not govern the relationship between Donovan and Quade. Donovan contends that she did not sign the written partnership agreement and that her signature on the document is a forgery.

98. Donovan maintains that the written partnership agreement was created for a lawsuit which she and Quade were defending against several other persons who claimed to have been additional co-authors of LNC. Donovan explains that she and Quade believed that if they had a written partnership agreement between themselves, a court might be more accepting of their testimony that they were the only authors. Donovan says that the written partnership agreement was never used because the litigation was settled without needing to present the document to the court. Doc. 220 at 6.

99. Quade suggests, without explicitly stating, that Donovan is judicially estopped from denying the validity of the written partnership agreement because Donovan approved the terms of the written partnership agreement by her conduct when she instructed their attorney to prepare the document for use as evidence in a lawsuit to prove the existence of a partnership between Donovan and Quade. See also In re Airadigm Communications, Inc., 616 F.3d 642, 661 & n.14 (7th Cir. 2010) (noting the doctrine of judicial estoppel is invoked by the court at its discretion and can be raised by courts *sua sponte* because judicial estoppel concerns the integrity of the judicial system independent of the parties).

100. Federal law governs with respect to judicial estoppel, even in diversity cases. Jarrard v. CDI Telecommunications, Inc., 408 F.3d 905, 914 (7th Cir. 2005).

101. "Judicial estoppel is an equitable concept that prevents parties from playing 'fast and loose' with the courts by prevailing twice on opposing theories." Airadignm Communications, 616 F.3d at 661. Thus, "'[j]udicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so." Levinson v. United States, 969 F.2d 260, 264 (7th Cir. 1992); Walton v. Bayer Corp., 643 F.3d 994, 1002 (7th Cir. 2011) (stating "[i]ts purpose is to deter fraud in litigation.").

102. No precise or rigid formula guides the application of judicial estoppel. Jarrard, 408 F.3d at 914; New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (noting that "[c]ourts have observed that '[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle.'").

103. Nevertheless, several factors are relevant in deciding whether application of the doctrine of judicial estoppel is appropriate in a particular case. New Hampshire, 532 U.S. at 750. First, a party's position must be clearly inconsistent with its earlier position. Second, the party must have prevailed on the basis of its earlier position "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court

was misled." Id. Third, courts consider whether the party asserting the inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 751.

104. Application of judicial estoppel is appropriate in this case. Donovan is judicially estopped from arguing that the written partnership agreement does not control the parties' relationship and is invalid because she did not sign it. It is inconsistent to create a written partnership agreement for use in litigation and later say that the same written partnership agreement is invalid and does not control the parties' relationship because it was never signed. Donovan testified that the earlier lawsuit settled, and the written partnership agreement was not shown to the other side or the court. Even though Donovan may not have used the written partnership agreement as a defendant in the lawsuit, the Court has no trouble concluding that by agreeing to create a written partnership agreement and backdate it with the intent of using it in litigation to persuade the court that they were the only authors of LNC, Donovan sufficiently attached herself to the validity of that written partnership agreement for judicial estoppel purposes. To allow Donovan to deny the validity of the written partnership agreement in this case by admitting that she and Quade manufactured it as false evidence in the prior action would allow her to obtain an unfair advantage by changing positions to fit the exigencies of the moment and disrespects the judicial process. Tr. 266 (Donovan explaining that the written partnership agreement "was intended to be a thing for a lawsuit. It had nothing to do with reality."). Prohibiting Donovan from changing positions regarding the validity of the written partnership agreement protects the integrity of the judicial process.

105. The fact that Donovan and Quade settled the earlier lawsuit apparently without using the written partnership agreement in the lawsuit does not prevent application of judicial estoppel. Commonwealth Ins. Co. v. Titan Tire Corp., 398 F.3d 879, 887 (7th Cir. 2004); Kale v. Obuchowski, 985 F.2d 360, 361-62 (7th Cir. 1993). A favorable settlement may be sufficient to show that the

party to be estopped prevailed in the prior case regardless of whether a written decision was issued. Titan, 398 F.3d at 887; Kale, 985 F.2d at 362 (stating that "[p]ersons who triumph by inducing their opponents to surrender have "prevailed' as surely as persons who induce the judge to grant summary judgment.").

106. The settlement of the earlier lawsuit substantially benefitted Donovan. Donovan paid only $82,500 to settle the case, and the settlement allowed Donovan and Quade to remain the sole co-authors of LNC. LNC has been wildly successfully and generated approximately $30 million in box office revenues worldwide. Doc. 225 at 1; Tr. 272.

107. Having created the written partnership agreement with the intention of backdating it to use in the earlier lawsuit and successfully settling that lawsuit, Donovan cannot be permitted to have it both ways by now taking the opposite position in federal court and claiming that the written partnership agreement is invalid and does not control the parties' relationship.

108. Even if the written partnership agreement is valid, Donovan argues that the written partnership agreement is ambiguous on the issue of non-collaborative LNC sequels. Under Illinois law, if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence. Curia v. Nelson, 587 F.3d 824, 829 (7th Cir. 2009). "The question of contract ambiguity turns largely on whether the contract language is 'reasonably susceptible to more than one meaning.'" Id. (quoting Susmano v. Associated Internists of Chi., Ltd., 422 N.E.2d 879, 882 (Ill. App. 1981)). There are two types of contract ambiguity: intrinsic and extrinsic. Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 879 (7th Cir. 2000). Extrinsic ambiguity exits when a perfectly clear agreement is unclear when applied to the real-world context of the deal. Id. A document is intrinsically ambiguous when it is "internally unclear or inconsistent as when it is 'reasonably and fairly susceptible to more than one meaning.'" Home Ins. Co. v. Chicago and Northwestern Transportation Co., 56 F.3d 763, 768 (7th Cir. 1995). "In determining whether the contract is intrinsically ambiguous, [courts] will not add another term, about which the

agreement is silent, to reach a more equitable result, nor can any word be deleted from the agreement to change the plain, ordinary meaning of the contractual terms." Id. at 769. Illinois courts strive to construe contracts as a whole, giving meaning and effect to each provision. Interim Health Care, 225 F.3d at 879. The determination of whether a contract is ambiguous is a question of law. Curia, 587 F.3d at 829.

109. The principal issue to be resolved is whether the written partnership agreement unambiguously requires Donovan to split royalties and profits from Donovan's Sequels which use the character "Sister" and were authored by Donovan without Quade's input. The Ownership provision of the written partnership agreement provides in relevant part that Donovan and Quade "share equally in the ownership of the plays they have co-authored as well as "any characters created in these works"; that they have "joint control over their use"; and that they "share equally in any benefits or expenses related to the use or licensing of these works or the characters we have created." Defs' Exh. 24. However, the Outside Income provision of the written partnership agreement states: "Our agreement does not pertain to any income that Vicki Quade or Maripat Donovan earn outside of our collaborative writing, or to any work that each of [u]s does individually." Defs' Exh. 24.

110. Quade argues that under the Ownership provision, she and Donovan share control and use of LNC sequels featuring "Sister" even if written by one of them without the other one's input. Donovan disagrees with Quade's interpretation. Donovan asserts that the Outside Income provision cannot be interpreted as requiring the parties to share equally in profits from non-collaborative works which feature "Sister."

111. The Court agrees with Donovan that the written partnership agreement is intrinsically ambiguous on the issue of royalties and profits from Donovan's Sequels. The Ownership paragraph can be read to cover Donovan's Sequels because it says Donovan and Quade share equally in the ownership and benefits related to the use and licensing of the "characters we have

created," which includes "Sister."  With this reading of the Ownership paragraph, the Outside Income paragraph's language excluding any income that Donovan or Quade earn outside of their collaborative writing or any work that each do individually creates an internal conflict in the document with respect to non-collaborative LNC sequels featuring "Sister."  The written partnership agreement leaves unclear whether non-collaborative LNC sequels featuring the "Sister" character are subject to the Outside Income provision as Donovan suggests, or to the Ownership provision, as Quade suggests.  Nothing in the remainder of the written partnership agreement clarifies the inconsistency.

112. The Ownership and Outside Income provisions are "reasonably susceptible to different construction" with regard to non-collaborative LNC sequels featuring the "Sister" character.  The written partnership agreement is therefore sufficiently ambiguous that extrinsic evidence may be required to clarify its meaning.  Home Ins. Co., 56 F.3d at 768-69. Tranzact Techs., Ltd. v. Evergreen Partners, Ltd., 366 F.3d 542, 547 (7th Cir. 2004) (stating if a contract contains terms that are ambiguous, a court must allow a party to "provide extrinsic evidence to support their proposition . . . rather than finding that the terms' ambiguity rendered the contract unenforceable."); Bard v. Harvey, 392 N.E.2d 371, 374 (Ill. App. 1979) (stating "where the language is ambiguous, extrinsic evidence, including prior negotiations between the parties, any oral understandings, and the parties' conduct, is admissible to determine the parties' intentions.").

113. The extrinsic evidence does not favor Quade's reading of the written partnership agreement regarding royalties and profits from non-collaborative LNC sequels featuring the "Sister" character.  Neither Donovan nor Quade offered any evidence of negotiation of the terms of the written partnership agreement.  There is no evidence that they discussed what the Ownership and Outside Income provisions mean with respect to non-collaborative LNC sequels featuring "Sister." There is no evidence that at the time of the drafting of the written partnership agreement, Donovan

and Quade understood or intended that the agreement would require them to split royalties and profits from non-collaborative LNC sequels. The evidence from that time period suggests that the parties considered jointly authored LNC sequels and in fact co-authored one LNC sequel in 1995 (*More Late Nite Catechism*), but there was no evidence indicating that they then contemplated non-collaborative LNC sequels. See Defs' Exh. 41(A) (Donovan referring to "our sequel to LNC" in 1995). Quade's own conduct does not support her position. Prior to this lawsuit, Quade never used the written partnership agreement to support her claim to 50% of the royalties and profits from Donovan's Sequels. Tr. 98-99, 104. In 2003, when the issue of Quade's entitlement to royalties from Entertainment Events' productions of Donovan's Sequels arose, Quade did not take the position that the written partnership agreement entitled her to 50% of Donovan's royalties. Pl's Exh. 32. Finally, the standard in the theater industry is the underlying rights owner receives royalties of a third of the amount paid to the author, not 50% of the author's royalties. Garfinkle Dep. at 11; NanoeXa Corp. v. University of Chicago, 2011 WL 1399264, at *3 (N.D. Ill. April 13, 2011) (stating under Illinois contract law, appropriate extrinsic evidence includes industry custom).

114. Quade has not established that Donovan breached the terms of their 1995 partnership agreement by failing to evenly split the royalties and profits generated by Donovan's Sequels.[4]

---

[4] Defendants' Proposed Findings of Fact and Conclusions of Law includes an argument that Donovan breached the partnership agreement by failing to comply with her fiduciary duties owed to the partnership and Quade. Defendants argue that Donovan breached the fiduciary duty she owed to Quade and the partnership by producing LNC in California through Donovan, Inc. beginning on September 11, 2004, producing LNC in the Chicago region through Donovan, Inc. beginning on November 18, 2006, and producing Donovan's Sequels in California and in the Chicago region beginning on September 12, 2004. Quade's breach of contract claim based upon a breach of fiduciary duty is duplicative of QDE's diversion of corporate opportunity claim in Count III because both claims are based on the same operative facts and the same injury. Doc. 271 at 40-41, 45-46. As explained with respect to Count III, by producing LNC through Donovan, Inc., Donovan breached her fiduciary duty to QDE. Because production of LNC sequels was an individual, not a corporate, opportunity, Donovan did not breach her fiduciary duty to QDE by producing Donovan's Sequels in California and Chicago through Donovan, Inc.

## 2. Deprivation of Copyright Revenues (Count II)

115. Each co-author of a joint work has the right to use or license use of the work, subject to accounting to the other co-owners for any profits. Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068 (7th Cir. 1994). Donovan and Quade are co-owners of LNC and their rights include the right to produce and license derivative works of LNC. Pickett v. Prince, 207 F.3d 402, 405 (7th Cir. 2000) (stating "[t]he Copyright Act grants the owner of a copyright the exclusive right to prepare derivative works based upon the copyrighted work.").

116. Quade claims she is entitled to an accounting with respect to profits from derivative works of LNC allegedly retained improperly by Donovan. "An equitable accounting is an adjustment of the accounts of the parties and a rendering of judgment for the balance ascertained to be due." Triple Canopy, Inc. v. Moore, 2005 WL 1629768, at *5 (N.D. Ill. July 1, 2005).

117. Quade's equitable claim for division of profits from exploitation of the copyrighted work is a determination which arises under state rather than federal law. Gaiman v. McFarlane, 360 F.3d 644, 652 (7th Cir. 2004).

118. In a suit for an equitable accounting, the party seeking the remedy must prove by a preponderance of the evidence that she has the right to the remedy. Hall v. Eaton, 631 N.E.2d. 833, 837 (Ill. App. 1994). As a co-owner of the copyrighted work, Donovan has an equitable duty to provide an accounting of profits she obtained from exploitation of the copyrighted work. Erickson, 13 F.3d at 1068. On October 15, 2009, this Court granted partial summary judgment to Quade on her claim for deprivation of copyright revenues. Doc. 151 at 12. The Court held that "Donovan must account for profits earned from her exploitation of derivative works of LNC." Id. Donovan's Sequels are derivative works of LNC. Id.

119. Quade is entitled to a reasonable royalty for Donovan's use of the "Sister" character in Donovan's Sequels. Donovan provided expert testimony that "one third of the author's" royalty payment is the standard underlying rights payment in the theater industry for derivative works. Garfinkle testified that the "one third of the author's" royalty payment has been generally accepted by his peers in the theater industry. Quade did not challenge Garfinkle's use of "one third of the author's" payment as the standard underlying rights payment in the theater industry through cross-examination or through her own expert witnesses.

120. Quade contends that a reasonably royalty rate in this case is 50% of the profits Donovan made producing and licensing Donovan's Sequels. Quade proposes that the Court use the Georgia-Pacific framework for determining a reasonable royalty rate for derivative works of LNC. Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D. N.Y. 1970). The fifteen Georgia-Pacific factors are generally used in patent cases to determine the amount of a hypothetically negotiated royalty for a patent license. The Georgia-Pacific factors are, in brief: (1) royalties that a patentee receives for the patent in suit; (2) rates licensee pays for use of other comparable patents; (3) nature and scope of the license; (4) the licensor's established policy regarding licensing of its technology; (5) commercial relationship between the parties; (6) effect on and extent of derivatives or convoyed sales; (7) duration and term of license; (8) established profitability of the product made under the patent, its commercial success, and popularity; (9) utility and advantage of the patented article over old modes; (10) nature of patented invention; character of commercial embodiment of the patent as owned or produced by the licensor; (11) extent to which infringer has made use of invention; (12) portion of profit or selling price customarily allowed; (13) portion of realizable profit attributable to invention; (14) the opinion testimony of qualified experts; (15) the amount a willing licensor and licensee would agree upon at the time of infringement, had both been reasonably and voluntarily trying to reach agreement, including the amount of profit the licensee would be willing to contribute to the license. Id.

121. Quade applies a modified Georgia-Pacific test, weighing the three factors she contends are applicable to this case: (a) the nature and scope of the license (factor 3); (b) the commercial relationship between the licensor and licensee (factor 5); and (c) the amount that a licensor and licensee would have agreed upon (factor 15). With respect to the nature and scope of the license, Quade says that the right to produce and license sequels of LNC is squarely within the prospective line of Donovan and Quade's business. With respect to the commercial relationship, Quade points out that she and Donovan are business partners, co-directors, officers, and equal shareholders of a corporation that specializes in the line of business to which LNC sequels squarely fall. Quade next argues that because Donovan's Sequels were a prospective business opportunity of QDE, the parties would have agreed to a 50-50 split of profits for non-collaborative LNC sequels featuring "Sister," which is what they followed for LNC since the beginning of their partnership.

122. The Court rejects Quade's modified Georgia-Pacific approach. Quade has not identified any case that has applied the Georgia-Pacific factors to a determination of a reasonable royalty for use of a derivative work. As Quade concedes, most of the factors are not relevant here. Quade applied only three of the fifteen factors in the Georgia-Pacific case. The Court cannot accept Quade's positive characterization of factor nos. 3 and 15 because the business of QDE was limited to producing and licensing LNC, not non-collaborative LNC sequels. Georgia-Pacific factor nos. 3, 5, and 15 do not justify a reasonable royalty rate higher than the theater industry standard. With respect to factor no. 14, Quade ignored the opinion testimony of Donovan's expert, David Garfinkle. Garfinkle testified that a reasonable underlying rights royalty rate for derivative works in the theater industry is a third of the author's royalty payment. Factor 14 negatively impacts Quade's position of a higher royalty rate of 50% of the author's profits.

123. With respect to Donovan's productions of Donovan's Sequels, Donovan maintains that Quade may have a claim against Entertainment Events for underlying rights payments but she is

not entitled to recover royalty payments from Donovan because she produces Donovan's Sequels under a license from Entertainment Events. Donovan's argument is not supported by the law or the facts. While Donovan is correct that "an author of a joint work does not acquire an authorship interest in derivative works that utilize part of the joint work," Quade is entitled to compensation for Donovan's use of the joint work. <u>Ashton-Tate Corp. v. Ross</u>, 916 F.2d 516, 523 (9th Cir. 1990). The general rule is that "each co-owner has an independent right to use or to license the use of the copyright, [but that a] co-owner must account to other co-owners for any profits he earns from licensing or use of the copyright." <u>Oddo v. Ries</u>, 743 F.2d 630, 633 (9th Cir. 1984). Donovan must account for profits to Quade for use of the original joint work in Donovan's Sequels. Entertainment Events owes no duty of accounting to Quade for Donovan's production of Donovan's Sequels. <u>Davis v. Blige</u>, 505 F.3d 90, 100 (2d Cir. 2007) (stating "a licensee need not pay any royalties or other consideration to the co-owners who are not parties to the license agreement."). Nothing in the agreements with Entertainment Events changes these general principles and absolves Donovan from her obligations to account to Quade as a co-owner for use of the original joint work LNC in Donovan's Sequels.

124. After considering the evidence presented by the parties, the Court finds that the standard theater industry royalty rate of one third of the author's royalty payment is appropriate to compensate Quade for use of the "Sister" character in Donovan's derivative works. The Court notes that the ten percent author's royalty rate Donovan received from Entertainment Events for Donovan's Sequels is on the high end of the range of reasonableness identified by Garfinkle, and appropriately accounts for the success of LNC.

125. For Entertainment Events' productions of Donovan's Sequels, Donovan received a 10% royalty of the net adjusted gross box office receipts as an author's royalty. The underlying rights payment is a third of said 10%. Donovan's records reflect that she received earnings of $1,156,760 from the performances of Donovan's Sequels produced by Entertainment Events for

not entitled to recover royalty payments from Donovan because she produces Donovan's Sequels under a license from Entertainment Events. Donovan's argument is not supported by the law or the facts. While Donovan is correct that "an author of a joint work does not acquire an authorship interest in derivative works that utilize part of the joint work," Quade is entitled to compensation for Donovan's use of the joint work. <u>Ashton-Tate Corp. v. Ross</u>, 916 F.2d 516, 523 (9th Cir. 1990). The general rule is that "each co-owner has an independent right to use or to license the use of the copyright, [but that a] co-owner must account to other co-owners for any profits he earns from licensing or use of the copyright." <u>Oddo v. Ries</u>, 743 F.2d 630, 633 (9th Cir. 1984). Donovan must account for profits to Quade for use of the original joint work in Donovan's Sequels. Entertainment Events owes no duty of accounting to Quade for Donovan's production of Donovan's Sequels. <u>Davis v. Blige</u>, 505 F.3d 90, 100 (2d Cir. 2007) (stating "a licensee need not pay any royalties or other consideration to the co-owners who are not parties to the license agreement."). Nothing in the agreements with Entertainment Events changes these general principles and absolves Donovan from her obligations to account to Quade as a co-owner for use of the original joint work LNC in Donovan's Sequels.

124. After considering the evidence presented by the parties, the Court finds that the standard theater industry royalty rate of one third of the author's royalty payment is appropriate to compensate Quade for use of the "Sister" character in Donovan's derivative works. The Court notes that the ten percent author's royalty rate Donovan received from Entertainment Events for Donovan's Sequels is on the high end of the range of reasonableness identified by Garfinkle, and appropriately accounts for the success of LNC.

125. For Entertainment Events' productions of Donovan's Sequels, Donovan received a 10% royalty of the net adjusted gross box office receipts as an author's royalty. The underlying rights payment is a third of said 10%. Donovan's records reflect that she received earnings of $1,156,760 from the performances of Donovan's Sequels produced by Entertainment Events for

royalties and consulting fees.  Defs' Exh. 54; Tr. 219-23.  Quade is entitled to one-half of a third of Donovan's 10% author royalties.  Quade is not entitled to a portion of the consulting fees Entertainment Events paid Donovan.  Tr. 186.  The total amount of author royalties Donovan received from Entertainment Events' presentations of Donovan's Sequels is $882,700. Doc. 276-3. A third of $882,700 or $294,233 represents the underlying rights payment.  For EEI's production of Donovan's Sequels, Quade is entitled to receive half of $294,233 or $147,116.50 as her underlying rights payment.

126. For Donovan's productions of Donovan's Sequels, 10% of Donovan's revenues is a reasonable allocation for a royalty payment to Donovan as the author of the sequels.  Donovan's records reflect that she earned $1,533,823 for her production of Donovan's Sequels.  Ten percent of $1,533,823 is $153,382.  A third of $153,382 or $51,127 represents the underlying rights payment.  For Donovan's production of Donovan's Sequels, Quade is entitled to receive half of $51,127 or $25,563.50 as her underlying rights payment.

### 3.     Diversion of Corporate Opportunity (Count III)

127. QDE argues that Donovan breached her fiduciary duty to the corporation by (1) producing LNC in California and Chicago through Donovan, Inc. and not QDE and (2) producing and licensing Donovan's Sequels through Donovan, Inc. and not QDE.

128. Individuals who control corporations owe a fiduciary duty to their corporation and its shareholders.  Levy v. Markal Sales Corp., 643 N.E.2d 1206, 1214 (Ill. App. 1994).  Directors and officers of a corporation have a duty "to deal openly and honestly" with each other and to "exercise the utmost good faith and honesty in all dealings and transactions" relating to each other and to the corporation.  Id.

129. Shareholders in a close corporation owe each other fiduciary duties similar to those of partners in a partnership.  Anest v. Audino, 773 N.E.2d 202, 209 (Ill. App. 2002).  They owe a

duty of loyalty to the corporation and to other shareholders. Id. "The precise nature and intensity of the duty of loyalty depends, however, upon the degree of independent authority exercised by the fiduciary and the reasonable expectations of the parties at the beginning of the relationship." Dremco, Inc. v. South Chapel Hill Gardens, Inc., 654 N.E.2d 501, 504 (Ill. App. 1995).

130. The corporate opportunity doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities that belong to the corporation. Lindenhurst Drugs, Inc. v. Becker, 506 N.E.2d 645, 650 (Ill. App. 1987). "A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage." Id. To determine whether the corporation had an actual or expectant interest in the opportunity, courts consider "the facts presented as well as the nature of the business of the corporation." Dremco, 654 N.E.2d at 505. As a general rule, "when a corporation's fiduciary wants to take advantage of a business opportunity which is in the corporation's line of business, . . . the fiduciary must first disclose and tender the opportunity to the corporation." Levy, 643 N.E.2d at 1215. A corporation's fiduciary is not permitted to usurp a business opportunity which was developed through use of corporate assets. Id. at 1217. As the accused fiduciary, Donovan has the burden of establishing the fairness and propriety of her transactions. Id. at 1214.

131. Donovan does not deny that she owed a fiduciary duty to QDE.

132. There is no question that the production of LNC in California and Chicago was a corporate opportunity which belonged to QDE. By producing LNC in California and Chicago through Donovan, Inc. and not QDE, Donovan appropriated for her own benefit a business opportunity which properly belonged to QDE. Quade is entitled to half of the unpaid profits Donovan generated through her production of LNC in California and Chicago or $104,285. *See supra* ¶¶ 72, 73, 75.

133. Donovan testified that she made payments to Quade from the Los Angeles office of QDE into 2008. Tr. 354. Without documentation or testimony as to a reasonable estimate of the amount of those payments , it is too speculative to make an adjustment as a credit against Quade's recovery.

134. QDE also contends that the production of Donovan's Sequels and licensing of Donovan's Sequels to Entertainment Events represented a corporate opportunity of QDE and that Donovan breached her fiduciary duty to QDE when the opportunity was not presented to QDE.

135. The Court rejects QDE's breach of fiduciary/corporate opportunity claim as to Donovan's Sequels.

136. There is no allegation or evidence that Donovan used QDE assets to produce and license Donovan's Sequels.

137. Although QDE may have had the capacity to produce and license non-collaborative LNC sequels, producing and licensing non-collaborative LNC sequels was not within the scope of QDE's business and was an individual, not a corporate, opportunity. Quade did not author or collaborate on any of Donovan's Sequels. Donovan individually owns the copyrights to Donovan's Sequels and the right to license them.

138. The evidence indicated that the business and purpose of QDE was limited to a single project, the licensing and production of LNC, and did not extend to the production and licensing of non-collaborative LNC works. Donovan and Quade began their business association in 1993 when they began working together on LNC. In 1993, they co-authored LNC, produced LNC at the Live Bait Theater, began sharing LNC profits, and registered LNC as co-authors with the U.S. Copyright Office. Two years later, Donovan and Quade adopted a written partnership agreement which evidences the parties' intent and the extent they wished to be bound. The written partnership agreement recognizes that Donovan and Quade may "in the future, create other plays or scripts *together*, or *revise the works we have already created*." (emphasis added). The written

partnership agreement includes various commitments between Donovan and Quade regarding "Quade/Donovan works," "collaborative works," and "coauthored works." At the time the partnership agreement was written in 1995, neither party contemplated a non-collaborative LNC sequel.

139. The parties' 1995 agreement explicitly envisioned and allowed Donovan and Quade to individually pursue and profit from non-collaborative works. Donovan and Quade expressly agreed that the written partnership agreement "does not pertain to any income that Vicki Quade or Maripat Donovan earn outside of our collaborative writing, or to any work that each of [u]s does individually." Donovan and Quade thus agreed in broad terms that they would be free to author and profit from non-collaborative works of any nature. Donovan and Quade were not bound to each other except with respect to collaborative or co-authored works. Dremco, 654 N.E.2d at 505-06; see also 805 ILCS 206/103(a) & (b)(3)(i) (providing that "relations among partners and between the partners and the partnership are governed by the partnership agreement" and that the partnership agreement "may identify specific types or categories that do not violate [a partner's fiduciary duties], if not manifestly unreasonably.").

140. From 1996 through 2000, when QDE was formed, Donovan and Quade only produced LNC. The incorporation of QDE in 2000 did not change the limited scope of Donovan and Quade's business arrangement. The incorporation did not alter how Donovan and Quade's business was run or owned. *See supra* ¶ 20. After incorporation, Donovan and Quade conducted the same business in the same fashion. The only difference was the legal entity they selected to do business. When the parties met with Hal Roseth in 2003 to mediate their differences, there was no discussion or agreement regarding non-collaborative LNC sequels. Tr. 491. Their business remained limited to LNC alone until Quade unilaterally produced her LNC sequels through QDE beginning in 2005.

141. Because earning income outside of their collaborative writings and individually profiting therefrom was expressly permitted by the terms of the parties' agreement and the incorporation of QDE did not alter that business arrangement, that conduct cannot constitute grounds for a breach of fiduciary duty/corporate opportunity claim.

142. Defendants point out that neither the articles of incorporation or the subscription agreement limit QDE's activities to LNC alone. The language in the articles of incorporation and subscription agreement which provides that QDE was incorporated for the "transaction of any or all lawful purposes for which corporations may be incorporated" does not compel a different result. See Vogel v. Sullivan, 735 F.Supp. 1353, 1360 (N.D. Ill. 1990) (holding similar language was not proof that corporation engaged in all such activity and stating "the articles of incorporation do not encompass the minimum that a corporation must do but rather the maximum that it can."). There was no agreement at the time QDE was formed that this language in the articles of incorporation and subscription agreement meant the parties' business arrangement was no longer limited to producing and licensing LNC. Tr. 422, 476.

143. For these reasons, the Court concludes that Donovan did not usurp a corporate opportunity from QDE when she licensed and produced Donovan's Sequels through Donovan, Inc.

144. Count III seeks imposition of a constructive trust for Quade's benefit to be imposed on future profits Donovan will earn from her unilateral exploitation of LNC and its derivatives. (Doc. 271 at ¶ 130). Under Illinois law, a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving the benefit to convey the property back to the person from whom it was received. Martin v. Heinold Commodities, Inc., 643 N.E. 2d 734, 745 (Ill. S.Ct. 1994); Charles Hester Enterprises Inc. v. Illinois Founders Ins. Co., 499 N.E.2d 1319, 1326 (Ill. S.Ct. 1986) (stating a "constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct."). "Where property has been acquired wrongfully, the party in possession may be declared to be a constructive trustee of the property if

it would be unjust for that party to retain it." <u>Charles Hester Enterprises</u>, 499 N.E.2d at 1326. "The constructive trust arises by operation of law, and the constructive trustee's sole duty is to transfer title and possession to the beneficiary." <u>Id</u>.

145. Quade has not demonstrated that imposition of a constructive trust to disgorge any future profits that Donovan may earn exploitation of LNC or its sequels is necessary here as each party is already entitled to an equitable accounting from the other of profits from the copyrighted work and its derivatives. As a joint author and co-owner of a copyrighted work, Donovan has an equitable duty to account to Quade for Quade's share of any future profits from the use or licensing of their joint work. <u>Gaiman</u>, 360 F.3d at 652. Thus, the relief available by accounting and constructive trust appear duplicative. <u>Martin</u>, 643 N.E.2d at 745 (stating "an action for an accounting is similar to an action to impose a constructive trust in that the action seeks the return of any benefit, or profit, conferred upon the breaching party.").

### 4. Accounting (Count V)

146. As a co-author and co-owner of LNC, Quade is entitled to an accounting for one half of the profits Donovan generated for her production of LNC in Chicago since September 19, 2009, one half of the profits she generated for her production of LNC in California since November 24, 2009, one half of a third of the revenues from Donovan's productions of Donovan's Sequels since February 27, 2010, and one half of a third of the author royalties Donovan has received from Entertainment Events since March 2010.

147. Donovan's argument that QDE is not entitled to an accounting related to LNC because QDE did not have a property right in LNC or a right to perform LNC is without merit. QDE had the right to produce LNC based on a permissive license granted by Donovan and Quade. *See supra* ¶ 24.

148. For the first time in this long litigation, Donovan untimely asserts the affirmative defense of unclean hands to Defendants' request for an accounting. Doc. 270 at 3, 24. Federal Rule of Civil Procedure 8(c)(1) requires a defendant to include affirmative defenses like unclean hands in her answer, which Donovan did not do. Doc. 96. Nor did Donovan include this defense in the final pretrial order or her trial brief. Docs. 220, 227.

149. Even if Donovan were allowed to assert her late defense of unclean hands, it has no merit. For unclean hands to apply, a party's misconduct "must rise to the level of fraud or bad faith" and that conduct "must directly involve the transaction which is the subject of the litigation." Gambino v. Boulevard Mortg. Corp., 922 N.E.2d 380, 417 (Ill. App. 2009). While Donovan obviously disagrees with Quade's management of the Chicago branch of QDE, Donovan did not establish that Quade committed fraud or acted in bad faith. The salary issue between the parties was resolved in 2003 and any back pay owed to Donovan was paid. With respect to the challenged expenses, the evidence showed that the Chicago and Los Angeles offices incurred similar expenses for rent, booking fees, and group sales fees. There was no showing that there was a substantial difference in other expenses involved in productions done through Chicago versus Los Angeles. Quade's failure to pay out profits from offsites after June 2003 was not improper. The parties agreed at the June 2003 meeting with Hal Roseth that going forward, they would pay out profits, if any, at year's end after paying all expenses. Quade says and there was no showing otherwise that profits were not shared from the Chicago office after 2003 because the office was unprofitable after 2003. Donovan has had full access to the Chicago QDE financial statements. Nor did Donovan show that Quade's management of the Chicago branch of QDE amounts to the same transaction as Donovan's failure to account for her production and licensing of LNC and Donovan's Sequels.

## IV.    Conclusion

Defendants are entitled to judgment on Counts III and IV of Donovan's Amended First Amendment to Complaint.  Donovan is entitled to judgment on Count V of Donovan's Amended First Amendment to Complaint.  QDE is dissolved pursuant to Section 12.56(b)(12) of the IBCA (805 ILCS 5/12.56).   Donovan is entitled to judgment on Count I of the Second Amended Counterclaim.  Quade is entitled to judgment on Count II of the Second Amended Counterclaim for deprivation of copyright revenues related to Donovan's Sequels in the amount of $172,680. *See supra* ¶¶ 125-26.   QDE is entitled to judgment on Count III of the Second Amended Counterclaim for diversion of corporate opportunity related to Donovan's LNC productions in the amount of $208,570.  Quade is entitled to recover half of this amount or $104,285.  *See supra* ¶ 132.

Defendants are entitled to judgment on Count V of their Second Amended Counterclaim. By November 28, 2011, Donovan shall provide Quade with an accounting for profits she generated for her production of LNC in Chicago since September 19, 2009, profits she generated for her production of LNC in California since November 13, 2009, revenues from Donovan's productions of Donovan's Sequels since February 27, 2010, and author royalties Donovan has received from Entertainment Events since March 2010.  *See supra* ¶¶ 74, 76, 80, 82.  Upon receipt of the accounting information for the years 2009-2010 going forward and by December 5, 2011, Defendants may move the Court for any further relief they believe appropriate in light of the accounting information.  Subject to the accounting, the Court reserves entry of final judgment in this case.  Gaiman, 360 F.3d at 648 (noting that "[t]he accounting [was] not yet complete, so the judgment [was] not final.").

Defendants request prejudgment interest but fail to provide a basis for such an award, an appropriate rate of interest, and a specific method of calculation, including a starting date.

Because Defendants provide no analysis and cite no authority to support their request for prejudgment interest, the Court denies Defendants' request.

A separate order of dissolution will be entered and the Clerk of the Court will deliver a certified copy of the order to the Secretary of State. 805 ILCS 5/12.65(a). Counsel shall prepare a joint proposed order of dissolution and deliver it to chambers by November 28, 2011. The Court directs the winding up and liquidation of QDE's business and affairs in accordance with Section 12.30 of the IBCA and the notification of its known claimants in accordance with Section 12.75 of the IBCA. 805 ILCS 12.65(b). The Court retains jurisdiction over this matter until the winding up and liquidation of QDE is complete. 805 ILCS 12.65(b). Any issues regarding implementation of the dissolution order can be brought to the Court's attention by motion.

**E N T E R:**

_____
**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: November 16, 2011**